FILED

2013 May-31  PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| TOM J. MITCHELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CV-10-JEO-0965-S |
| | ) | |
| MODERN WOODMEN OF | ) | |
| AMERICA, | ) | |
| | ) | |
| Defendant. | | |

## DEFENDANT MODERN WOODMEN'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Modern Woodmen of America ("Modern Woodmen") moves the Court for summary judgment in its favor on all of the claims alleged in the Complaint and on its Counterclaim seeking a declaration regarding whether it is obligated to pay benefits under the two insurance certificates it issued on the life of Stephanie Mitchell. There is no genuine issue of material fact, and Modern Woodmen is entitled to judgment as a matter of law.

1

## TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Initial Statement of Undisputed Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . 6

Discussion of Relevant Legal Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

A.     Initial Overarching Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B.     Modern Woodmen is Entitled to Rescind the Insurance Certificates based on
       Stephanie Mitchell's Misrepresentations on the Face of the Insurance
       Applications and her Suppression and Concealment when Responding to
       Questions on the Insurance Applications. . . . . . . . . . . . . . . . . . . . . . . . . .47

       1.  Misrepresentations Regarding Other Insurance on the Face of the March
           26, 2008 Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

       2.  The Half Truth on the March 26, 2008 Application and
           Suppression/Concealment of the Truth that the Mitchells had Little or No
           Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

       3.  Misrepresentations on the Face of the August 4, 2008 Application and the
           September 2, 2008 Statement of Acceptance of Life Insurance . . . . . . . . .
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

       4.  The Half Truth On the August 4, 2008 Application and
           Suppression/Concealment of the Truth that the Mitchells had  No Income
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . .57

C.     Modern Woodmen Was Entitled to Rely on the Misrepresentations  in Tom
       Mitchell's Financial Questionnaire in Rescinding the Certificates. . . . . . 58

D.     Modern Woodmen Was Entitled to Rely on the Misrepresentations in the
       Reliable Reporting Interviews in Rescinding the Certificates. . . . . . . . . . 62

E.     Plaintiffs' Bad Faith Claim Fails As A Matter Of Law. . . . . . . . . . . . . . .63

1.  Plaintiffs would not be entitled to a directed verdict on the breach of contract claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

2.  There is no evidence that Modern Woodmen intentionally and without a legitimate or arguable reason refused to pay Plaintiffs' claim. . . . . . . . .65

3.  There is no evidence that Modern Woodmen acted with an intent to injure Stephanie Mitchell. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 67

4.  Plaintiffs' "abnormal" bad faith claim fails as a matter of law. . . . . . . . 68

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

INTRODUCTION

This dispute concerns two insurance certificates issued by Modern Woodmen on the life of Stephanie Mitchell, in April 2008 and in August 2008, brazen misrepresentations and omissions in connection with the applications for insurance, and a demand that Modern Woodmen pay the insurance proceeds anyway.

Stephanie Mitchell was murdered less than a year after the disputed insurance certificates were issued.  Following her death, Modern Woodmen discovered that not only had it insured Stephanie, other insurers had done so as well.  She had three life insurance policies with American General Life & Accident Insurance Company ("American General") and another policy with Stonebridge Life Insurance Company ("Stonebridge").  All told, at the time of her death, Stephanie Mitchell was insured for over $4.5 million dollars, including $850,000 in accidental death benefits.

Stephanie Mitchell worked in the family businesses, Mitchell Motors and Mitchell Marine, with her common-law husband, Tom Mitchell.  Tom Mitchell had been selling cars as Mitchell Motors for some time (neither business was incorporated), but in early 2006, he began to focus more on selling boats as Mitchell Marine.  These businesses were the Mitchells' only source of income.

Tom Mitchell considered Stephanie his business partner.  She kept the books and did the paperwork (tax papers, bills of sale and the like).  She also handled sales, talking with customers and telling them the prices of boats (or cars if there were any on the lot).

In 2007, the year before Stephanie first applied to Modern Woodmen for life insurance, the income of these businesses had been only $4,521.  As 2008 began, they had approximately $6000 in the bank and inventory valued at $16,500 (at most).  No new inventory was purchased during 2008.  Through March 2008, sales at the businesses totaled $5,850.  The last sale of the year was made in May 2008, and through that point, total sales were $13,850, leaving nothing or next to nothing on the lot.  Tom Mitchell reported on his 2008 tax return that the inventory of the businesses at the end of the year was $0.00 and that the inventory sold during the year had cost as much as the sales revenue it had generated such that the businesses had *no* profit and *no* income.  At year-end 2007 and throughout 2008, Tom Mitchell had more than $80,000 in credit card debt.

Yet with no income and what little was left of the family businesses, Stephanie Mitchell went shopping for life insurance—millions of dollars of life insurance.

Following Stephanie Mitchell's death, Modern Woodmen conducted a claim review.  Its investigation revealed that Stephanie made material misrepresentations

5

and omissions on her applications for insurance regarding both her income and her other insurance.  If she had told the truth on the applications, no insurance would have been issued.  Because of this, Modern Woodmen denied coverage.

In order to understand the misrepresentations, omissions, and the context of this dispute, the Court must begin its examination of the undisputed facts starting in 2005.

## MODERN WOODMEN'S INITIAL STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS

1.      On April 19, 2005, Stephanie Mitchell applied to American General for $200,000 in life insurance coverage ("Policy No. 9954").  *See* Donna Berry Deposition, attached as Exhibit A, Evidentiary Submission ("ES")[1], ES 0004-05; Ex. 2 to Berry Depo., attached as Exhibit[2] B, ES 0062-64.

2.      On May 5, 2005, Stephanie Mitchell applied to American General for more insurance, seeking $200,000 in life insurance coverage and $200,000 in accidental death coverage ("Policy No. 4364").  *See* Ex. A, ES 0011; Ex. 12 to Berry Depo., attached as Exhibit C, ES 0067-69.

---

[1] For the Court's convenience, Modern Woodmen will identify the Bates number of the referenced documents.

[2] The American General documents cited in support of Modern Woodmen's motion meet the business records exception to the hearsay rule. *See* Ex. A, ES, 0034-36.  Specifically: (1) they were made in the regular course of American General's business; (2) American General has a regular practice to make such records; (3) the records were made at or near the time of the recorded event; and (4) the records contain information transmitted by a person with knowledge of the information within the document.  *Id.*

3.     On May 6, 2005, American General issued Policy No. 9954 on the life of Stephanie Mitchell, with a face amount of $200,000.  *See* Ex. A, ES 0006; Ex. 3 to Berry Depo., attached as Exhibit D, ES 0072.  If an American General policy is issued as applied for, the policy is mailed directly to the policy owner.  *See* Ex. A, ES 0006.  If an American General policy is conditionally issued (amended in any way), the policy is mailed to the agent for delivery to the applicant because there is an amendment form that has to be accepted.  *Id*.  Because American General Policy No. 9954 was issued as applied for, it was mailed to Stephanie Mitchell.  *Id*.

4.     On May 12, 2005, American General issued Policy No. 4364 on the life of Stephanie Mitchell, with a face amount of $200,000 and an additional $200,000 in accidental death coverage.  *See* Berry Depo., Ex. A, ES 0011; Ex. 13 to Berry Depo., attached as Exhibit E, ES 0108.  Policy No. 4364 was delivered to Stephanie Mitchell on May 13, 2005.  *See* Consent to Alteration of Application, attached as Exhibit F, ES 0145.

5.     On July 14, 2005, Stephanie Mitchell signed a policy change application seeking to add an additional $110,000 in life insurance coverage to American General Policy No. 9954.  *See* Berry Depo., Ex. A, ES, pp. 34-35; Ex. 8 to Berry Depo., attached as Exhibit G, ES 0146-47.

6.      On September 6, 2005, Policy No. 9954 was reissued by American General with an increased face amount of $310,000.  *See* Berry Depo., Ex. A, ES 0011;  Ex. 11 to Berry Depo., attached as Exhibit H, ES 0148.

7.      On July 13, 2007, Stephanie Mitchell signed a policy change application requesting that $300,000 in accidental death coverage be added to American General Policy No. 9954.  *See* Berry Depo., Ex. A, ES 0017; Ex. 23 to Berry Depo., attached as Exhibit I, ES 0149-52.

8.      On August 6, 2007, American General added $300,000 in accidental death benefits to Policy No. 9954.  *See* Berry Depo., Ex. A, ES 0019; Ex. 26 to Berry Depo., attached as Exhibit J, ES 0153; Ex. 27 to Berry Depo., attached as Exhibit K, ES 0154.

9.      On October 25, 2007, Stephanie Mitchell signed an affidavit that was filed in her divorce proceeding from Keith Allred.  *See* Stephanie Mitchell Affidavit, attached as Exhibit L, ES 0155.  The affidavit reflects that she was not currently employed and had no income.  *Id*.

10.     Stephanie Mitchell worked in the family businesses, Mitchell Motors and Mitchell Marine.  *See* Tom Mitchell Deposition, attached as Exhibit M, ES 0185-86; *see also* Judy Gackle Declaration, attached as Exhibit N; Certificate No. 8227615, attached as Exhibit 2 to Ex. N, ES 0301; Certificate No. 8248403, attached as Exhibit 4 to Ex. N, ES 0327.

11.     Tom Mitchell had been selling cars as Mitchell Motors for some time. *See* Mitchell Depo., Ex. M ES 0175-77; Selections from Ex. 2 to Mitchell Depo., attached as Exhibit O, ES 0342.   In March 2006, he began to focus more on selling boats as Mitchell Marine.  *See* Mitchell Depo., Ex. M, ES 0178; Ex. O, ES 0343.  He got out of the car business and into the boat business.  *See* Mitchell Depo., Ex. M, ES 0177-79, 192; Ex. O, ES 0343.

12.     Tom Mitchell considered Stephanie Mitchell his partner in the businesses.  *See* Mitchell Depo., Ex. M, ES 0189.  Stephanie kept the books for Mitchell Motors and Mitchell Marine.  *See* Mitchell Depo., Ex. M,ES 0186-88. She handled paperwork, including tax papers and bills of sales.  *Id*.  Both she and Tom Mitchell wrote checks on the company checking accounts.  *See* Mitchell Depo., Ex. M ES 0236.  Stephanie also handled sales, talking with customers and telling them the price of the boats or of any cars on the lot.  *Id.*, p. 123.

13.     Other than child support, Tom and Stephanie Mitchell's only source of income during the years 2007 and 2008 was Mitchell Motors and Mitchell Marine.  *See* Mitchell Depo., Ex. M, ES 0189.

14.     Tom Mitchell's federal income tax return for 2007 reflects total income of $4,521.  *See* Ex. 9 to Mitchell Depo., attached as Exhibit P, ES 0427; Mitchell Depo., Ex. M, ES 0207.

15.     Neither Mitchell Motors nor Mitchell Marine were incorporated.  *See* Mitchell Depo., Ex. M, ES 0175.  Therefore, the income and expenses of those businesses were shown on Schedule C (Profit or Loss from Business) of Tom Mitchell's federal income tax return.  *See* Ex. 9 to Mitchell Depo., Ex. P, ES 0427. His 2007 Schedule C shows gross receipts of $73,950, cost of goods sold of $42,500, gross income of $31,450, and business expenses (not including any salary or officer compensation) of $26,929, leaving a profit or income of $4,521.  *Id.* Schedule C also shows a beginning inventory of $39,000, inventory purchases of $6,000 during the year and an ending inventory for the year of $2,500.  *Id.*, MN 4435.

16.     The 2007 sales tax returns for both Mitchell Marine and Mitchell Motors show total sales during the year of $73,650.  *See* Deposition of Tommy Turpin, attached as Exhibit Q, ES 0484; *see also* Selections from Ex. 2 to Mitchell Depo., Ex. O, ES 0344-98.  Wilson's Bookkeeping routinely prepared the sales tax returns for Mitchell's businesses.  *See* Mitchell Depo., Ex. M, ES 0178

17.     Tom Mitchell's net worth at year-end 2007 was, at most, $163,806. *See* Turpin Depo., Ex. Q, ES 0479.  At the end of 2007, Tom Mitchell had over $83,000 in credit card debt.  *See* Exhs. 10, 11, 12 and 13 to Mitchell Depo., attached collectively as Exhibit R, ES 0394, 0499, 0503, 0509; Mitchell Depo., Ex. M, ES 0212-18.   His credit cards were nearly maxed out; he had only

10

approximately $4,500 in available credit remaining.  *See* Ex. R, ES 0394, 0499, 0503, 0509.

18.    As of year-end 2007/early 2008, the combined balances in the checking accounts of Mitchell Motors and Mitchell Marine was $6,023.14.  *See* Mitchell's Business Accounts Bank Statements, collectively attached as Exhibit S, ES 0515, 0519, 0523-25.

19.    At the end of 2007, the balance in Tom and Stephanie Mitchell's joint checking account was $27.78.  *See* Joint Checking Account Statements, collectively attached as Exhibit T, ES 0533.

20.    At the end of 2007, Stephanie's personal checking account was overdrawn by $1.51.  *See* Stephanie Mitchell's Checking Account Statements, collectively attached as Exhibit U, ES 0535.

21.    On February 21, 2008, Tom Mitchell applied for $1,000,000 in life insurance from Modern Woodmen and submitted a Financial Form 186 in connection with the application.  *See* Gackle Decl., Ex. N, ES 0274-75; Mitchell Depo., Ex. M, ES 0202; Ex. 7 to Mitchell Depo., attached as Exhibit 1 to Ex. N, ES 0280.  Tom Mitchell said he had salary or wages of $40,000-$50,000 year to date, and salary or wages of $280,000 in the prior year.  *Id*.  He said he had $60,000-$70,000 in net business or professional income in the prior year.  *Id*.  He

11

also said he had assets of $4,000,000, liabilities of $850,000, and a net worth of $3,150,000. *Id.*

22.     Tom Mitchell testified that he had no reason to believe that Modern Woodmen's agent wrote something down on the financial form that Tom did not give him the information for. *See* Mitchell Depo., Ex. M, ES 0202. When asked about the $40,000 to $50,000 salary or wages number for year to date, Tom testified, "I guess that's what I said at the time." *Id.*, p. 189.

23.     The truth is that, through the end of February 2008, the sales tax returns filed with the State of Alabama show that there had been $4,350 in sales for both Mitchell Motors and Mitchell Marine year-to-date. *See* Turpin Depo., Ex. Q, ES 0486-87; Selections from Ex. 2 to Mitchell Depo., Ex. O, ES 0399-403.

24.     On February 27, 2008, Stephanie Mitchell signed a policy change application requesting a $200,000 increase in coverage on American General Policy No. 9954. *See* Berry Depo., Ex. A, ES 0020; Ex. 28 to Berry Depo., attached as Exhibit V, ES 0537-40. The policy change application specifically identified, by policy number and face amount, Stephanie's two existing American General policies, Policy No. 9954 in the then current face amount of $310,000 and No. 4364 in the then current amount of $200,000. *Id.*

25.     As the end of February 2008, Tom Mitchell had almost $84,000 in credit card debt. *See* Exhs. 10, 11, 12 and 13 to Mitchell Depo., Ex. R, ES 0495,

0500, 0504, 0510; Mitchell Depo., Ex. M, ES 0212-16.   His credit cards were

nearly maxed out; he had only approximately $3,100 in available credit remaining.

*See* Ex. R, ES 0495, 0500, 0504, 0510.

26.     At the end of February 2008, the combined balance in the checking

accounts of Mitchell Motors and Mitchell Marine was $12,134.89.  *See* Mitchell's

Business Accounts Bank Statements, Ex. S, ES 0515-16, 0526-27.

27.     At the end of February 2008, the balance in the joint checking account

of Tom and Stephanie Mitchell remained $27.78, and Stephanie's personal

checking account remained overdrawn.  *See* Joint Checking Account Statements,

Ex. T, ES 0534; Stephanie Mitchell's Checking Account Statements, Ex. U, ES

0536.

28.     On March 26, 2008, Stephanie Mitchell signed an application seeking

$1,000,000 in life insurance coverage and $350,000 in accidental death coverage

from Modern Woodmen.  *See* Certificate No. 8227615, attached as Exhibit 2 to

Exhibit N, ES 0282-306.

29.     Section H of the Application is titled "Adult Non-Medical

Information" and asks the applicant to provide information and answer questions

about the applicant's employment, income, and existing life insurance, among

other topics.  *Id*., ES 0301.  In response to the questions in Section H, Stephanie

said she was employed by Mitchell Marine as a secretary/housewife, and that she

13

kept the books for her husband's businesses.  *Id*.  In response to the question about her annual income, she said her husband was the owner of the business and they had a shared income.  *Id*.

30.     Question 3a of Section H asked this question: "Have you applied for life insurance that is currently pending or are you planning on purchasing life insurance with another company?"  *See* Ex. 2 to Ex. N, ES 0301.  Stephanie answered "No" in response to question 3a.  *Id*.

31.     Question 3b of Section H asked, "Have you had life or health insurance rejected, rated, postponed, modified or cancelled?"  *Id*.  Stephanie answered "No" in response to Question 3b.  *Id*.

32.     By signing the application, Stephanie represented that she had answered the questions completely and truthfully:

> **AGREEMENT:  To the best of my knowledge and belief, the statements and answers given in this application, consisting of six pages, are true, complete, and correctly recorded.  It is understood and agreed that**:
>
> > 1. The statements and answers given in this application will be the basis for any insurance issued on this application.

*See* Ex. 2 to Ex. N, ES 0303 (emphasis in original).

33.      The certificate further states: "This certificate was issued based upon the answers on the application.  If all answers are not true and complete, insurance benefits may be affected."  *Id*., ES 0282.

14

34.     By signing the application, Stephanie represented that she had reviewed the answers to the questions contained in the application.  *See id*.

35.     Modern Woodmen's agent, Laura Williams, filled out an Agent's report as part of Ms. Mitchell's application to Modern Woodmen.  *See* March 2008 Agent's Report, attached as Exhibit 3 to Ex. N, ES 0308.  The report noted that Stephanie Mitchell "works with her husband, Tom James Mitchell, and her financial questionnaire will be the same as his. If needed, I can get one although she doesn't draw a salary from their businesses."  *Id*.

36.     At the time of her March 26, 2008 application to Modern Woodmen, the truth was that Stephanie Mitchell had $510,000 in life insurance coverage, $500,000 in accidental death coverage and an application for an additional $200,000 in life coverage pending with American General.  *See* Berry Depo., Ex. A, ES 0011, 0019-20; Ex. 13 to Berry Depo., Ex. E, ES 0108; Ex. 11 to Berry Depo., Ex. H, ES 0148; Ex. 28 to Berry Depo., Ex. V, ES 0537-40.

37.     The truth was that, through the end of March 2008, sales for both Mitchell Motors and Mitchell Marine year-to-date totaled $5,850.  The truth was that, at the time of the March 26, 2008 application, the Mitchells had little if any income.  *See* Turpin Depo., Ex. Q, ES 0486-87; Selections from Ex. 2 to Mitchell Depo., Ex. O, ES 0399-46.

38.     On April 9, 2008, Reliable Reporting Services[3] conducted a

telephone interview of Stephanie Mitchell regarding her pending life insurance

application with Modern Woodmen.  *See* April 9, 2008 Interview, attached as

Exhibit 1 to Exhibit W, ES 0544-60.  Stephanie said she was employed by Mitchell

Marine and Mitchell Motors, was a co-owner of the businesses, engaged in

managerial duties and worked over 40 hours a week.  *Id*., DPMW 0358.  She said

she had more than $1,000,000 in real estate assets, $1,000,000 in other real estate

assets and $200,000 in vehicles and personal assets.  *Id*., DPMW 0360.  She was

unable to provide a breakdown of her total assets and liabilities.  *Id*.  The Reliable

Reporting interview form lists $70,000+ under the heading Salary and $80,000+ in

the space for spouse's income.  *Id*.  When asked about existing insurance,

Stephanie said she had a small policy that she was keeping, and that she did not

recall the amount or name of the insurance company.  *Id*.

39.     Leslie Brown, a senior underwriter at Modern Woodmen, underwrote

Stephanie Mitchell's first application.  *See* Deposition of Leslie Brown, attached as

Exhibit X, ES 0561.  In doing so, she relied on the application, Tom Mitchell's

---

[3] The Reliable Reporting documents provided in support of Modern Woodmen's motion for summary judgment meet the business records exception to the hearsay rule. *See* Declaration of Reliable Reporting, attached as Exhibit W, ES 0541-42.  Specifically: (1) they were made in the regular course of Reliable Reporting's business; (2) Reliable Reporting has a regular practice to make such records; (3) the records were made at or near the time of the recorded event; and (4) the records contain information transmitted by a person with knowledge of the information within the document.  *Id*.

Financial Form 186, the Reliable Reporting interview summary, the Agent's report and other documents. *Id*., pp. 88-89, 103, 125, 131-32.  She relied on Tom Mitchell's financial questionnaire because Stephanie said in the application that she shared income with her husband and because she was directed to Tom's financial questionnaire by the statement in the Agent's report. *See* Brown Depo., Ex. X, ES 0561-62, 0572 , 0575, 0581-82.

40.     If Ms. Brown had not been able to consider the shared income of Tom and Stephanie Mitchell in making a decision about whether to issue the first certificate, she would not have issued any insurance on Stephanie's life.  *See* Brown Depo., Ex. X, ES 0615-17.

41.     The application questions asking for information about other life insurance that is in force and that has been applied for are important, from an underwriting perspective, because Modern Woodmen considers all existing insurance and all insurance that has been applied for in determining whether the insurance being applied for is appropriate.  *See* Brown Depo., Ex. X, ES 0567; Deposition of Judy McCoy, attached as Exhibit Y, ES 0637 and Ex. 12 to McCoy Depo., attached as Exhibit Z, ES 0677.

42.     Modern Woodmen utilizes an "income times factor" chart in determining the maximum amount of insurance that an applicant qualifies for.  *See* Brown Depo., Ex. X, ES 0576.  That chart is found in Factfinder, Modern

Woodmen's intranet that is available both to its underwriters and to its agents in the field.  *Id.*  At her age, Stephanie Mitchell qualified for a total line of life insurance, meaning the total amount with all insurers, of 25 times her annual earned income.  *See* Brown Depo., Ex. X, ES 0576, McCoy Depo., Ex. Y, ES 0637; Ex. 12 to McCoy Depo., Ex. Z, ES 0677.

43.     The application question asking about accidental death coverage the applicant has in force is important, from an underwriting perspective, because Modern Woodmen has a policy that the total amount of accidental death coverage on any insured with all insurers may not exceed $350,000.  *See* Brown Depo., Ex. X, ES 0569; McCoy Depo., Ex. Y, ES 0666; Ex. 12 to McCoy Depo., Ex. Z, ES 0679.  This policy is set out in FactFinder.  *Id.*

44.     If Stephanie Mitchell had disclosed the truth about her existing accidental death coverage in her first Modern Woodmen application (that she had $500,000 in existing AD coverage), Modern Woodmen would not have issued the first Modern Woodmen insurance certificate, No. 8227615, insuring Stephanie for $1 million in life coverage and $350,000 in accidental death coverage.  *See* Brown Depo., Ex. X, ES 0609.

45.     If Stephanie Mitchell had disclosed on her first Modern Woodmen application her true shared income, Modern Woodmen would not have issued any insurance on her life.  *See* Brown Depo., Ex. X, ES, pp. 120, 230, 233-34, 239.

46.     On April 22, 2008, Modern Woodmen issued Certificate No. 8227615 insuring the life of Stephanie Mitchell.  *See* Certificate No. 8227615, Ex. 2 to Ex. N, ES 0284.

47.     The last month during 2008 that either Mitchell Motors or Mitchell Marine sold a car or a boat (or anything else) was May 2008.  *See* Turpin Depo., Ex. Q, ES 0485; Selections from Ex. 2 to Mitchell Depo., Ex. O, ES 0412.  Total sales through May 2008 were $13,850.  *See* Selections from Ex. 2 to Mitchell Depo., Ex. O, ES 0399-410.

48.     Tom Mitchell filed monthly sales tax returns throughout 2008.  *See* Selections from Ex. 2 to Mitchell Depo., Ex. O, ES 0399-0426.  The returns for June through November reflect sales of $0.00.  *Id.*, ES 0413-25.  The November return notes that the business closed on November 30, 2008.  *Id.*, ES 0425.

49.     Neither Mitchell Motors nor Mitchell Marine bought any new inventory during 2008.  *See* Ex. 14 to Mitchell Depo., attached as Exhibit AA, ES, 0706.  Taking into account the sales made through May 2008, the inventory of the businesses that was available for sale at that point was (at most) $2,650.  *Id.*, Selections from Ex. 2 to Mitchell Depo., Ex. O, ES 0399-410.

50.     Schedule C of Tom Mitchell's 2008 federal income tax return shows a beginning inventory of $16,500 and an ending inventory of $0.00.  *See* Ex. 14 to Mitchell Depo., attached as Exhibit AA, ES 0706. The return also shows that the

cost of the goods that were sold during the year was $16,500 such that there was no gross profit and no income.  *See* Ex. 14 to Mitchell Depo., Ex. AA, ES 0705. Taking into account business expenses of $3,350, Mitchell Motors and Mitchell Marine reported a negative income for the year of -$3,350.  *Id.*

51.     On June 19, 2008, Stephanie Mitchell applied to American General for $1,000,000 in life insurance coverage ("Policy No. 3305").  *See* Berry Depo., Ex. A, ES 0025; Ex. 38 to Berry Depo., attached as Exhibit BB, ES 0712-16. Stephanie listed $300,000 as her annual earned income.  *See* Ex. 38 to Berry Depo., Ex. BB, ES 0712.

52.     The American General application asked, "Does any proposed insured have a life insurance policy or annuity contract in force or have any pending application for a life insurance policy or annuity contract with this Company or another company?"  *Id.*, ES 0713.  Stephanie listed $710,000 in existing life insurance with American General.  *Id.*  She did not mention her existing $1,000,000 life insurance certificate with Modern Woodmen.  *Id.*

53.     The American General application also asked, "Has any proposed insured ever had application for insurance modified, rated, declined, postponed or withdrawn?"  *See* Berry Depo., Ex. A, ES 0026; Ex. 38 to Berry Depo., Ex. BB, ES 0713.  Stephanie answered, "Yes."  *Id.*

20

54.     On June 19, 2008, Stephanie signed a financial questionnaire in connection with her application for an additional $1 million in life insurance coverage from American General.  *See* Berry Depo., Ex. A, ES 0026; Ex. 39 to Berry Depo., attached as Exhibit CC, ES 0717-18.  Stephanie said she had $300,000 in salary or wages for both the previous year and the current year, $150,000 in bonuses and/or commissions for both the previous year and the current year, $450,000 in net business or professional income for both the previous year and the current year, for a total income of $900,000 for both years.  *See* Ex. 39 to Berry Depo., Ex. CC, ES 0717.  Stephanie also stated that she had $2,500,000 in personal assets and $500,000 in business assets for both the previous year and the current year, for a total net worth of $3,000,000 for both years.  *Id.*

55.     By the summer of 2008, Tom Mitchell had maxed out all but one of his credit cards.  *See* Exhs. 10, 11, 12 and 13 to Mitchell Depo, Ex. R, ES 0496-98, 0501-02, 0505-08, 0511-14 .  He admitted in his deposition that by that point, he was probably not paying his credit cards.  *See* Mitchell Depo., Ex. M, ES 0234.

56.     On August 1, 2008, American General made the initial decision to decline Stephanie's application for the additional $1 million in coverage.  *See* Berry Depo., Ex. A, ES 0028.  American General prepared a letter dated August 4, 2008, to notify Stephanie that the application had been rejected.  *Id.*, ES 0028-30;

*see also* Ex. 42 to Berry Depo., attached as Exhibit DD, ES 0719.  The letter was sent by regular mail.  *Id.*

57.    On August 4, 2008, Stephanie submitted an application to Modern Woodmen for an additional $1,000,000 in life insurance coverage.  *See* Certificate No. 8248403, attached as Exhibit 4 to Ex. N, ES, DPMW 0425.

58.    In response to the questions asked in Section H of the application, Stephanie said she was a housewife, she worked with her husband and she kept the books for her husband's businesses.  *See* Certificate No. 8248403, Ex. 4 to Ex. N, ES 0327.

59.    In response to the question about her annual income, Stephanie directed Modern Woodmen to Tom Mitchell's Financial Form 186.  *Id.*

60.    Question 3a of Section I of the Modern Woodmen application asked this question: "Have you applied for life insurance that is currently pending or are you planning on purchasing life insurance with another company?"  *See* Certificate No. 8248403, Ex. 4 to Ex. N, ES 0327.  Stephanie answered "No" in response to question 3a.  *Id.*

61.    Question 3b of Section H asked, "Have you had life or health insurance rejected, rated, postponed, modified or cancelled?"  *Id.*  Stephanie answered "No" in response to Question 3b.  *Id.*

22

62.     By signing the application, Stephanie represented that she had

answered the questions completely and truthfully:

**AGREEMENT:  To the best of my knowledge and belief, the statements and answers given in this application, consisting of six pages, are true, complete, and correctly recorded.  It is understood and agreed that**:

1. The statements and answers given in this application will be the basis for any insurance issued on this application.

*See* Certificate No. 8248403, Ex. 4 to Ex. N, ES 0329 (emphasis in original).

63.     By signing the application, Stephanie represented that she had

reviewed the answers to the questions contained in the application.  *Id.*

64.     Leslie Brown also underwrote Stephanie Mitchell's August 4, 2008

insurance application with Modern Woodmen.  *See* Brown Depo., Ex. X, ES 0591.

As before, in doing so, she relied on the application and on Tom Mitchell's

financial questionnaire because the application directed her to the questionnaire.

*Id*., pp. 167-68**.**  *See* Declaration of Leslie Brown, attached as Exhibit EE, ES

0722.

65.     As before, Ms. Brown relied on Stephanie Mitchell's statements in the

application regarding her other existing insurance in determining whether it was

appropriate to issue the insurance she was applying for—that she had no other life

insurance and had no insurance applications pending.  *See* Brown Depo., Ex. X, ES

0609; *see also* Brown Declaration, Ex. EE, ES 0722.

23

66.     At the time of her August 4, 2008 application to Modern Woodmen, the truth was that Stephanie Mitchell had $1,000,000 in life insurance with Modern Woodmen, $710,000 in life insurance with American General, and $200,000 of that life insurance with American General had a rating higher than standard.  *See* Certificate No. 8227615, Ex. 2 to Ex. N, ES 0282-306; Berry Depo., Ex. A, ES 0006, 0011, 0019-20;  Ex. 3 to Berry Depo., Ex. D, ES 0072; Ex. 13 to Berry Depo., Ex. E, ES 0108.

67.     The truth was that Stephanie had already applied for an additional $1,000,000 in life insurance coverage from American General and either (1) she believed the application remained pending; or (2) she already knew that American General had rejected her application for the additional $1,000,000 in coverage.  *See* Berry Depo., Ex. A, ES 0024; Ex. BB, ES 0712-16.

68.     The truth was that by early August 2008, Mitchell Motors and Mitchell Marine were, for all intents and purposes, out of business.  *See* Selections from Ex. 2 to Mitchell Depo., Ex. O, ES 0417-18.

69.     The truth was that, when Stephanie Mitchell applied to Modern Woodmen for insurance on August 4, 2008, she had no income, shared or otherwise.  *Id*.

70.   The truth was that, when Stephanie Mitchell applied to Modern Woodmen for insurance on August 4, 2008, neither she nor Tom Mitchell had any income. *Id*.

71.   On August 7, 2008, Stephanie Mitchell applied for $1 million in life insurance coverage and $500,000 in accidental death coverage from Prudential Life Insurance Company ("Prudential").[4]  *See* Prudential Application, attached as Ex. FF, ES 0725-28.  On the application, Stephanie said she had no earned annual income, but that her spouse's annual income was $240,000.  *Id*., ES 0725.  She listed Modern Woodmen's Certificate No. 8227615, in the face amount of $1 million, as her only existing insurance; she did not disclose the $350,000 in accidental death benefits afforded by the Modern Woodmen certificate.  *Id*., ES, 0726.  Stephanie did not list on the Prudential application any of her existing American General policies.  *Id*.

72.   On August 13, 2008, Reliable Reporting Services conducted a telephone interview of Stephanie Mitchell regarding her second application to Modern Woodmen.  *See* August 13, 2008 Interview, attached as Ex. 1 to Ex. W, ES 0547-49.  Stephanie said she was employed by Mitchell Marine and Mitchell Motors, was a co-owner of the businesses, engaged in managerial duties and

---

[4] The Prudential documents used in support of Modern Woodmen's motion for summary judgment meet the business records exception to the hearsay rule.  *See* Affidavit of Kristina Galdi, attached as Exhibit GG, ES 0729.

25

worked over 40 hours per week.  *Id.*, ES 0547.  She said she had $1,000,000 in real estate assets, $300,000 in vehicles and personal assets, $1,000,000 in business value and total assets of $2,300,000.  *Id.*, ES, 0549.  The interview form reflects that Stephanie Mitchell's liabilities were zero, total liabilities were $2,300,000 and her net worth was $2,300,000.  *Id*.  However, the "$2,300,000 in total liabilities" appears to have been a recording error, and Modern Woodmen's underwriter assumed that Stephanie had no liabilities such that her net worth was $2,300,000.  *See* Brown Depo., Ex. X, ES 0593.  The Reliable Reporting form lists $240,000 under the heading Salary, and Modern Woodmen's underwriter considered this the shared income of Tom and Stephanie, not just Stephanie, when making a decision about whether to issue the second certificate.  *Id.*, ES 0615-16. When asked about her existing insurance, Stephanie stated only that she was "updating MWA; keeping."  *Id*.

73.    On August 14, 2008, Stonebridge issued a life insurance policy to Stephanie Mitchell.  *See* Stonebridge Policy, attached as Exhibit HH, ES 0730-37. The policy provides a $100,000 death benefit.  *Id.*, ES 0737.

74.    On August 26, 2008, Modern Woodmen issued its Certificate No. 8248403 insuring the life of Stephanie Mitchell for $1,000,000.  *See* Certificate No. 8248403, attached as Ex. 4 to Ex. N, ES 0312.

75.     On August 28, 2008, American General issued Policy No. 20803305

on the life of Stephanie Mitchell with a face amount of $1,000,000.  *See* Berry

Depo., Ex. A, ES 0032; Ex. 46 to Berry Depo., attached as Exhibit II, ES 0738-64.

76.     On September 2, 2008, when Modern Woodmen's Certificate No.

8248403 was delivered, Stephanie signed a Statement of Insurability in which she

represented to Modern Woodmen:

> [T]hat since the earliest of the date of the application and the dates of
> all medical examinations required by Modern Woodmen of America
> for this life insurance certificate, no person proposed for insurance
> has:
> …
> (d) Applied for other life or health insurance, or for reinstatement
> which was declined or issued other than applied for, or had renewal
> refused.
> …
> I hereby represent that all of the foregoing statements are true and
> correct and that I have fully stated all exceptions.

*See* Statement of Acceptance of Life Insurance Certificate, attached as Exhibit 5 to

Ex. N, ES 0334-35.

77.     On March 28, 2009, Stephanie Mitchell died from gunshot wounds to

the head, and her death was ruled a homicide.  *See* Death Certificate, attached as

Exhibit JJ, ES 0765.

78.     Because Stephanie died within two years of the issuance of her

certificates, Modern Woodmen conducted a claim review.  *See* Gackle Declaration;

Ex. N, ES, 0276.  As part of that review, Modern Woodmen hired Altima

27

Informational Services, Inc. ("Altima") on March 31, 2009 to interview the beneficiary, obtain authorizations, and gather records. *Id*.

79.     By April 13, 2009, Altima had forwarded authorizations to Tom Mitchell for his signature so Altima could obtain medical records from Stephanie Mitchell's health care providers. *See* Gackle Declaration, Ex. N, ES 0276.

80.     In July 2009, Altima had not received signed authorizations from Tom Mitchell, and re-sent the required authorizations to him. *Id*.

81.     Tom Mitchell submitted the signed authorizations to Altima in September 2009. *Id*.

82.     On April 14, 2010, Tom Mitchell and Brittany Allred filed this lawsuit against Modern Woodmen. *See generally* Complaint, Doc. 1.

83.     On July 21, 2010, Modern Woodmen served Tom Mitchell and Brittany Allred with its First Set of Interrogatories and Requests for Production. *See* First Set of Discovery Requests, attached as Exhibit KK, ES 0775. Modern Woodmen served eighteen requests for production, and requested, among other documents, tax returns, documents reflecting income the plaintiffs or Stephanie Mitchell had earned, documents relating to applications and policies for life insurance, account statements, deposit slips or other records for bank accounts, documents reflecting loans or mortgages, and Stephanie's medical records. *Id*., ES 0766-75.

28

84.     In response, Tom Mitchell and Brittany Allred's attorney explained by letter that "Tom Mitchell is a Gypsy who does not keep many records, relying instead upon banks and businesses with whom he has contact to keep any records that may be responsive to your request." *See* August 24, 2010 Letter from Joel Dillard, attached as Exhibit LL, ES 0776.

85.     In response to Modern Woodmen's first set of requests for production, Tom Mitchell and Brittany Allred produced approximately 1440 pages of documents. *See* August 30, 2010 Letter from Joel Dillard, attached as Exhibit MM.  They produced less than 85 pages that were not a reproduction of documents that American General had produced to them in related litigation. *Id.*

86.     Modern Woodmen served Tom Mitchell and Brittany Allred with sixteen additional requests for production in this lawsuit. *See* Second, Third and Fourth Sets of Discovery Requests, attached collectively as Exhibit NN, ES.  Tom Mitchell and Brittany Allred produced thirty-six additional pages of documents. *See* Plaintiffs' Discovery Letters and Responses, collectively attached as Exhibit 00, ES 0777-79.

87.     Over the course of this lawsuit, Modern Woodmen issued approximately sixty-five subpoenas to third-parties, including health care providers, other insurance companies, banks, and other financial companies, and

received over nine thousand pages of documents in response to these subpoenas. *See* Doc. 82, p. 2.

88.     The subpoenaed documents showed that, when Stephanie Mitchell signed Modern Woodmen's application dated March 26, 2008, she had $510,000 of insurance and $500,000 of accidental death coverage in force with American General, and $200,000 pending in life coverage from American General.  *See* Berry Depo., Ex. A, ES, pp. 41-42,44,74; Ex. 13 to Berry Depo., Ex. E, ES, AG/Mitchell00650; Ex. 11 to Berry Depo., Ex. H, ES, AG/Mitchell00010.

89.     These documents showed that, when Stephanie Mitchell signed Modern Woodmen's application for insurance dated August 4, 2008, she had $710,000 of life insurance and $500,000 of accidental death coverage in force with American General.  *See* Certificate No. 8227615, Ex. 2 to Ex. N, ES 0282-306; Berry Depo., Ex. A, ES 0006, 0011, 0019-20; Ex. 3 to Berry Depo., Ex. D, ES 0072; Ex. 13 to Berry Depo., Ex. E, ES 0108.  She had applied for an additional $1,000,000 in life insurance from American General which was either pending issue or had been declined.  *See* Berry Depo., Ex. A, ES 0025; Ex. BB, ES 0712-16.

90.     These documents showed Stephanie Mitchell was not employed in 2007 and had no income.  *See* Stephanie A. Mitchell Affidavit, Ex. L, ES 0155. Further, income tax records do not support the spousal income which she claimed

to share.  *See* Ex. 9 to Mitchell Depo., Ex. P, ES 042; Ex. 14 to Mitchell Depo., Ex. AA, ES 0703.

91.    These documents also showed that Stephanie Mitchell did not file federal income tax returns in 2006, 2007 or 2008.  *See* IRS Response, attached as Exhibit PP, ES 0809-0811.

92.    Tom Mitchell testified that he does not know what happened to any of the records from Mitchell Motors or Mitchell Marine.  *See* Mitchell Depo., Ex. M, ES 0192.

93.    These documents also showed that Stephanie Mitchell had applied for $1,000,000 in life insurance and $500,000 in accidental death coverage with Prudential on August 7, 2008, which application was declined by letter dated September 12, 2008.  *See* August 7, 2008 Prudential Application, Ex. FF, ES 0725-28; *see also* Prudential Letter, attached as Exhibit QQ, ES 0812.

94.    If Stephanie Mitchell had told the truth on her first application with Modern Woodmen about her existing accidental death coverage—that she had $500,000 in existing accidental death coverage from American General—Modern Woodmen would not have issued the first insurance certificate.  Modern Woodmen has a strict policy that the total accidental death coverage on an insured's life with all insurers may not exceed $350,000.  *See* Brown Decl., Ex. EE, ES 0721. Stephanie Mitchell's misrepresentation regarding her existing accidental death

31

coverage was material to Modern Woodmen's underwriting decision to issue that certificate.  *Id*.

95.    If Stephanie Mitchell had told the truth on her first application with Modern Woodmen about her shared income—that she and her husband had little or no income—Modern Woodmen would not have issued the first insurance certificate.  *See* Brown Declaration, Ex. EE, ES 0721.  That is especially the case in light of the fact that Stephanie Mitchell had $510,000 in existing life coverage and a $200,000 life insurance application pending with another company.  *Id*. Stephanie's failure to disclose the truth about her and her husband's shared income, and her misrepresentations about how much other existing and pending insurance she had, were material to Modern Woodmen's underwriting decision to issue that insurance certificate.  *Id*.

96.    If Stephanie Mitchell had disclosed the truth on her second application with Modern Woodmen—that she and her husband had little or no income and that she had $710,000 in existing life insurance— Modern Woodmen would not have issued the second insurance certificate.  Stephanie's failure to disclose the truth about her and her husband's income and her misrepresentation that she had no other insurance were material to Modern Woodmen's underwriting decision to issue that certificate.  *See* Brown Decl., Ex. EE, ES 0722.

97.      It is unknown whether Stephanie Mitchell knew when she applied to
Modern Woodmen for insurance on August 4, 2008, that her application to
American General for another $1 million in life insurance had been rejected.  *See*
Brown Decl., Ex. EE, ES 0722-23.   If she did, then she failed to disclose that on
the application in response to the question asking for that information.  *Id*.  If she
had disclosed that fact, Modern Woodmen's underwriter would have followed up
to try to determine the circumstances.  *Id*.  It would have been important to Modern
Woodmen's underwriter to know not only that she had been rejected for insurance
but why she had been rejected.  *Id*.

98.      Stephanie Mitchell applied for $1 million in life insurance and
$500,000 in accidental death coverage from Prudential on August 7, 2008, three
days after her second Modern Woodmen application.  *See* Brown Decl., Ex. EE,
ES 0723-24.  Stephanie Mitchell misrepresented in her September 2, 2008
Statement of Acceptance of Life Insurance Certificate that she had not applied for
other life insurance since the date of the application.  *Id*.  If Modern Woodmen's
underwriter had known about the pending Prudential application and about her
existing coverage with American General ($710,000 in life coverage and $500,000
in accidental death coverage), she would not have issued Certificate No. 8248403.
That is the case even if the information on Tom Mitchell's financial questionnaire
had been accurate.  *Id*.  Even in that event, taking into account her other insurance

that had been issued and applied for, the issuance of the insurance she was then

seeking from Modern Woodmen would have made her overinsured. *Id*.

Stephanie's misrepresentations about her other insurance and pending and/or

rejected applications would have been important to Modern Woodmen in making

its underwriting decision with respect to this certificate. *Id*.

99.    It would have been important to Modern Woodmen's underwriting to

know how much accidental death coverage Stephanie Mitchell already had and had

applied for in making its underwriting decision with respect to Certificate No.

8248403. *Id*.  Insurance applicants who have and are applying for large amounts

of life insurance coverage, together with large amounts of accidental death

coverage, are a red flag for Modern Woodmen's underwriter. *Id*.  If Modern

Woodmen's underwriter had known about Stephanie Mitchell's existing life

insurance and accidental death coverage—that she had $1.71 in life coverage and

$850,000 in accidental death coverage with Modern Woodmen and American

General— and that Stephanie had applied for $1 million in additional life

insurance and $500,000 in additional accidental death coverage from Prudential,

she would not have issued Certificate No. 8248403. *Id*.

100.   If Stephanie Mitchell had given candid, accurate and complete

answers on her applications for Modern Woodmen's certificates, no insurance

would have been issued. *See* Brown Decl., Ex. EE, ES 0724 .

34

101.   By letter dated February 29, 2012, Modern Woodmen informed Tom Mitchell of the information obtained during its claim review and its denial of coverage under the two certificates.  *See* Feb. 29, 2012 Gackle Letter, attached as Exhibit 6 to Ex. N, ES 0973-74.

102.   Modern Woodmen remitted to Tom Mitchell all premiums paid on both Modern Woodmen certificates.  *See* Gackle Declaration, Ex. N.

103.   By letter dated May 22, 2013, Modern Woodmen informed Tom Mitchell of additional information obtained during its claim review.  *See* May 22, 2013 Gackle Letter, attached as Exhibit 7 to Ex. N, ES 0340-41.[5]

## DISCUSSION OF RELEVANT LEGAL AUTHORITIES

Rule 56 of the Federal Rules of Civil Procedure sets out the legal standard for granting summary judgment, as follows:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *U.S.  v. One*

---

[5] For the Court's convenience, Modern Woodmen has enclosed a timeline attached as Exhibit RR.

*Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099,

1101 (11th Cir. 2004).  "The mere existence of some factual dispute will not defeat

summary judgment unless that factual dispute is material to an issue affecting the

outcome of the case.  The relevant rules of substantive law dictate the materiality

of a disputed fact.  A genuine issue of material fact does not exist unless there is

sufficient evidence favoring the nonmoving party for a reasonable jury to return a

verdict in its favor."  *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)

(citations omitted).

ARGUMENT

Plain and simple, Modern Woodmen is entitled to summary judgment

because it was induced to issue the two insurance certificates on the life of

Stephanie Mitchell by fraud.  *See generally* Ala. Code §§ 6-5-101 and 6-5-102.

That is the only conclusion that can be drawn from the undisputed facts.

Tom and Stephanie Mitchell's sole source of income during 2007, the year

before the certificates were applied for and issued, was selling cars as Mitchell

Motors and boats as Mitchell Marine.  Neither business was incorporated.  Tom

Mitchell had started Mitchell Marine in early 2006 and thereafter, the focus was on

selling boats rather than cars.  Stephanie kept the books for the businesses and also

handled sales.

The Mitchells' income for all of 2007 was $4,521.  At the end of the year, the businesses had inventory of, at most, $16,500. (Tom Mitchell's 2007 federal income tax return shows an ending inventory of $2,500, while his 2008 return shows a beginning inventory of $16,500.)  No new inventory was purchased during the year 2008, which is not surprising because the businesses had no capital to speak of.  At month end February 2008, the combined balance in the business checking accounts was approximately $12,000.  Gross sales to that point in the year had been only $4,350, leaving the Mitchells with approximately $12,000 in inventory on the lot to sell.

Tom and Stephanie Mitchell's personal finances were in no better shape.  At month end February 2008, the balance in their joint checking account was $27.78, and Stephanie's personal checking account was overdrawn.  Tom had over $80,000 in credit card debt.

It was in these dire circumstances that Stephanie Mitchell, on March 26, 2008, first applied to Modern Woodmen for an insurance policy that would provide $1 million dollars in life coverage and an additional $350,000 in accidental death coverage.  It was with this bleak backdrop that Stephanie did not tell Modern Woodmen the truth.  Responding to questions on the insurance application, Stephanie misrepresented the amounts of her other insurance, both life and accidental death.  She said she had $200,000 in existing life insurance with other

companies, no accidental death coverage and no life insurance applications

pending when, in fact, she had $510,000 in existing life coverage, $500,000 in

existing accidental death coverage and a $200,000 life insurance application

pending with another company.

When asked on the application what her income was, Stephanie Mitchell did

not disclose to Modern Woodmen that she and her husband had little or no income,

that the businesses for whom she kept the books were hanging on by a thread.  She

suppressed and concealed that information from Modern Woodmen.  Instead of

telling Modern Woodmen the truth, she stated on the application that she had

"shared income" with her husband.  She asked Modern Woodmen to use the

financial questionnaire Tom had filled out only a month before when applying to

Modern Woodmen for life insurance, stating that her financial questionnaire would

be the same as his.

Modern Woodmen did exactly what Stephanie Mitchell asked it to do.

Rather than make her fill out a separate financial questionnaire, because she

represented that their income was shared, Modern Woodmen looked to and relied

on Tom Mitchell's financial questionnaire in underwriting her application.  That

questionnaire represents that their income to date for the year was $40,000 to

$50,000 (a blatant lie) and that their income for the prior year was $280,000

(another blatant lie). The questionnaire also listed a net worth of more than $3 million (yet another blatant lie).

A service used by Modern Woodmen, Reliable Reporting, called Stephanie Mitchell on April 9, 2008, to verify the information provided on the application. Stephanie confirmed that she worked over 40 hours a week at Mitchell Marine and Mitchell Motors, that she engaged in managerial duties, that she had a small life insurance policy that she was keeping, that her income was $70,000+ and that her spouse's income was $80,000+.  These representations regarding her other insurance and the family income are indisputably false.

Things only got worse for the Mitchells during the year 2008.  Their last sale of a boat or car during the entire year was in May 2008, and gross sales to that point totaled only $13,850.  With a beginning inventory of $16,500 (as reported on Tom's 2008 federal income tax return), those sales left the businesses with (at most) $2,650 in inventory on the lot at the beginning of the summer.[6]  Tom admitted at deposition that by the summer of 2008, he probably was not paying his credit cards.

On August 4, 2008, Stephanie Mitchell applied to Modern Woodmen for additional life insurance.  This time she requested $1 million in life coverage.  She

---

[6]  Tom Mitchell's 2008 federal income tax return shows inventory at year-end of $0.00. The monthly sales tax returns filed during the year show that there were no sales after May. Therefore, it stands to reason that the inventory at the end of May was also $0.00.

listed her employment on the application as "Housewife, works with husband, keeps books for her husband's businesses."  In response to the direct question on the application regarding income, Stephanie again directed Modern Woodmen to Tom Mitchell's financial questionnaire – the application reads "check on Tom James Mitchell Financial Form 186."  She did not tell Modern Woodmen that the businesses for which she kept the books had not had a sale in months.  She did not disclose to Modern Woodmen that she and her husband had no income.

Stephanie represented to Modern Woodmen on the August 4, 2008 application that she had no life insurance with other companies.  In fact, she had $710,000 in existing life insurance with American General, and she had applied for an additional $1 million dollars in life coverage from that company.

American General made the initial decision to decline Stephanie's application for the additional $1 million in coverage on August 1 (a Friday), and a letter was prepared dated August 4, 2008, to notify her that the application had been rejected.  The letter was sent by regular mail.

It is unknown whether Stephanie knew of American General's rejection of her application when she submitted her August 4, 2008 application to Modern Woodmen.  Modern Woodmen's application specifically asked both whether she had any other life insurance applications pending and whether she had applied for life insurance and been rejected.  Stephanie answered "No" to both questions.  One

40

of those answers was a misrepresentation.  If she did not know about American General's rejection of her application, then she misrepresented that she did not have any other pending life insurance applications.  If she learned about the rejection from her American General agent on August 4, before applying to Modern Woodmen, then she misrepresented that she had not had a life insurance application rejected.  Either way, she misrepresented the truth.

The August 4, 2008 Modern Woodmen application also asked Stephanie whether she was planning to purchase life insurance with another company.  She answered "No."  But three days later, on August 7, 2008, she applied to Prudential for $1 million in life insurance and $500,000 in accidental death coverage, paying the initial premium.  And ten days later, on August 14, 2008, she applied for a $100,000 life insurance policy with Stonebridge.

On September 2, 2008, American General reversed its initial denial of Stephanie's application and issued the additional $1 million dollar policy she had requested.  On that same date, Modern Woodmen delivered to Stephanie the certificate for the $1 million in additional life coverage she had applied for.  When accepting the certificate, Stephanie represented to Modern Woodmen on her Statement of Acceptance of Life Insurance Certificate that since (the date of her application), she had not applied for other life insurance.  This of course was yet another misrepresentation as she had submitted life insurance applications to both

Prudential and Stonebridge and had continued her efforts to obtain coverage from American General.  All told, within the space of a month, Stephanie Mitchell had been issued $2.1 million in life insurance coverage (in addition to the $1.71 million in coverage she already had) and had applied for $1 million more.  This with not a single boat or car sale since May 2008, an empty or near empty boat/car lot, no income from the businesses and no other source of income.

At Modern Woodmen's request, on August 13, 2008, Reliable Reporting again called Stephanie Mitchell to confirm the information provided in her insurance application.  She represented that she worked more than 40 hours a week at Mitchell Marine and Mitchell Motors and that she had managerial responsibilities.  She reported income of $240,000, even though her family had no income.  When asked about existing insurance, she said only that she was updating her Modern Woodmen coverage.

The difficulty here is not in determining whether Stephanie Mitchell misrepresented and suppressed the truth from Modern Woodmen when applying for life insurance.  She unquestionably did.  Nor is there any difficulty in determining whether Modern Woodmen would have issued insurance coverage on Stephanie's life had she told the truth.  It unquestionably would not.  The only difficulty here is a human one, not a legal one.  It is in answering the question of why Stephanie Mitchell did what she did.  Why would the bookkeeper of failing

family businesses which are generating little revenue and no income apply for millions of dollars in life insurance?  Why would she misrepresent the truth not only to Modern Woodmen but to all the other insurers in order to try to obtain that coverage?  We may never know the answer to this question, but it need not be answered in order to grant Modern Woodmen summary judgment.

Plaintiffs' response to this blatant fraud is not that it didn't happen.  It clearly did.  Plaintiffs' position is two-fold.  First, Plaintiffs say that Modern Woodmen is not entitled to rely on statements not found on the face of the insurance applications.  Second, Plaintiffs contend that the false statements made on the face of the applications were not sufficiently material to justify rescission of the certificates.

Plaintiffs are wrong on both counts.  Modern Woodmen is entitled to rely on Stephanie Mitchell's misrepresentations made on the face of the applications, on her suppression and concealment when responding to questions on the applications and on the misrepresentations made both in Tom Mitchell's financial questionnaire and in the Reliable Reporting interviews.  Even if Modern Woodmen were not entitled to rely on the misrepresentations  in the financial questionnaire and Reliable Reporting interviews, Stephanie Mitchell's misrepresentations, suppression and concealment that are tied directly to the applications warrant summary judgment.

A.     Initial Overarching Matters

At the outset, Modern Woodmen wishes to address several overarching subjects.  First, it wants to set straight two matters argued in Plaintiffs' Motion for Summary Judgment that are simply wrong.  Plaintiffs say that in Modern Woodmen's initial claim denial letter dated February 29, 2012, it "unequivocally signaled its intent to travel under subpart (a)(3) of [Ala. Code § 27-14-7] in order to justify its denial of the claim."  Doc. 83, p. 20.  That isn't the case.  The cited statute does not even apply to Modern Woodmen, a fraternal benefit society governed by Chapter 34 of Title 27 of the Alabama Code.  *See* Ala. Code §§ 27-34-1(defining fraternal benefit society), 27-34-4 ("Except as provided in this chapter, societies shall be governed by this chapter and shall be exempt from all other provisions of the insurance laws of this state, not only in governmental relations with the state, but for every other purpose.  No law hereafter enacted shall apply to them unless they are expressly designated therein."), 27-34-54 (listing provisions of the Insurance Code which do apply to societies; §27-14-7 is not among those listed).

Second, Plaintiffs plainly misread the following language in the certificates: "The Society relies on statements made in the application for this certificate.  **These statements are deemed representations and not warranties except in the case of fraud**."  Doc. 83, p. 22 (emphasis in Plaintiffs' Motion).  Plaintiffs

conclude from this language in the certificate that Modern Woodmen

"contractually narrowed its ability to rely on representations (correct or incorrect)

made in the application to void a policy or to defend a claim made on a policy to

**only instances of fraud**."  *Id*., p. 23 (emphasis in Plaintiffs' Motion).  That is not

what the language says, and it is clearly not what the language means.

Historically, the law distinguished between warranties and representations.

False statements which were deemed warranties would void an insurance policy

even if the matter stated was not material.  *See Metropolitan Life Ins. Co. v.*

*Goodman,* 65 So. 449, 450 (Ala. App. 1914)("An affirmative warranty is in the

nature of a condition precedent, while a promissory warranty is in the nature of a

condition subsequent, to the contract; and whether affirmative or promissory, the

effect of a breach thereof by the insured is to relieve the liability of the insurer ,

and this regardless … of whether the matters warranted be material or not to the

risk …."). Misrepresentations, on the other hand, would not avoid an insurance

policy unless they were material.  *Id.* (" On the other hand, in order to avoid a

contract of insurance for false representations or misrepresentations not amounting

to warranties, which, as seen, are a mere inducement to the making of the contract,

it must appear, not only that the matters and things so represented are false, but

also they were material to the risk.")

With that historical backdrop in mind, what the certificate plainly says and what it plainly means is that statements made in the application are to be deemed representations (requiring that the matter be material to avoid the certificate) rather than warranties (in which case materiality need not be shown) except in the case of fraud.  Put slightly differently, if a statement is fraudulently made, it may be deemed a warranty.  Absent fraud, statements made in the application are to be considered representations.  But a misrepresentation need not be fraudulent to avoid coverage.

Further, Modern Woodmen wishes to address the legal standard for materiality, which is important to all of the argument that follows.  Material facts include those that "affect[], or [are] calculated to affect, the conduct of the [insurer] in the issue and delivery of the policy." *Sovereign Camp, W.O.W. v. Young*, 186 So. 453, 455 (Ala. 1939) (quoting *Sovereign Camp, W.O.W. v. Thompson*, 174 So. 761, 763 (Ala. 1937).

To be material, misrepresentations "need not be the sole inducement to the contract, nor the chief influence leading to action.  It is enough if, as a contributory influence, they operate upon the mind and conduct of the other party to any material extent." *Reliance Life Ins. Co. v. Sneed*, 117 So. 307, 310 (Ala. 1928).

Materiality is often considered a question of fact to be decided by the jury, but that is not uniformly the case. *See Young*, 186 So. at 456 (holding that an

applicant's "false answer in his application to the inquiry as to a previous rejection for life insurance was material to the risk as a matter of law…"). *Accord*, *Alfa Life Ins. v. Lewis*, 910 So.2d 757, 762 (Ala. 2005) (holding that misrepresentation was material as a matter of law, explaining that "the insurer need only establish that a misrepresentation in the application was a material contributing influence that induced the insurer to issue the policy." (addressed under Ala. Code § 27-14-7 but analogous)).[7] Here, the facts that Stephanie Mitchell misrepresented, suppressed and concealed were material as a matter of law.

  B.   Modern Woodmen was Entitled to Rescind the Insurance Certificates based on Stephanie Mitchell's Misrepresentations on the Face of the Insurance Applications and her Suppression and Concealment when Responding to Questions on the Insurance Applications.

"'Insurance companies are entitled to candid and truthful answers, and when such candor is withheld and involves matters material to the risk, no just complaint can be raised, when, in after investigations, the falsity is discovered and the policies issued in reliance upon the truthfulness of the statements, are avoided.'" *Liberty Life Ins. Co. v. Hale*, 230 So. 2d 526, 530 (Ala. 1970)(quoting *New York Life Ins. Co. v. Horton*, 180 So. 277, 282 (1938)).

---

[7] The *Lewis* court also pointed to the following cases from other jurisdictions: "*Christiana Gen. Ins. Corp of New York v. Great American Ins. Co.*, 979 F.2d 268, 280 (2d Cir. 1992)('Where the insurer specifically inquires as to a fact, the insured is thereby on notice that the insurer considers it material …'); *Jaunich v. National Union Fire Ins. Co. of Pittsburgh*, 647 F. Supp. 209, 211 (N. D. Cal. 1986)('Such information is particularly material when the information has been specifically requested as part of the insurance application …')." 910 So. 2d at 762.

In *Ex parte Porter*, 122 So. 2d 119, 124 (Ala. 1960), the Alabama Supreme

Court explained the relation as follows:

> 'Insurance policies are traditionally contracts uberrimae fidei and a
> failure by the insured to disclose conditions affecting the risk, of which he is
> aware, makes the contract voidable at the insurer's option.'… Uberrima
> fides is defined in Black's Law Dictionary, p. 1690. We quote as follows:
>
> 'The most abundant good faith; absolute and perfect candor or
> openness and honesty; the absence of any concealment or deception,
> however slight.  A phrase used to express the perfect good faith, concealing
> nothing, with which a contract must be made; for example, in the case of
> insurance, the insured must observe the most perfect good faith towards the
> insurer.'

Modern Woodmen is entitled to summary judgment because Stephanie

Mitchell did not provide candid and truthful answers in her insurance applications.

Rather, she misrepresented and suppressed the truth from Modern Woodmen about

matters material to the risk she asked that it undertake.  As in the authorities cited

above, no complaint can be raised now that the truth has been discovered and the

certificates rescinded.

> 1.    Misrepresentations regarding Other Insurance on the Face of
>        the March 26, 2008 Application

Stephanie Mitchell misrepresented on the March 26, 2008 application that

she had $200,000 in life insurance with all external companies, that she had no

accidental death coverage and that she had no life insurance applications pending.

The truth was that she had $510,000 in existing life insurance, $500,000 in existing

accidental death coverage and an application for an additional $200,000 in life insurance pending.

Stephanie Mitchell's misrepresentation that she had no accidental death coverage is alone enough to void the first Modern Woodmen certificate.  Modern Woodmen has a strict policy that an insured may be issued only $350,000 in accidental death coverage with all insurers.  This rule is set out in Modern Woodmen's FactFinder as follows: "The total AD on the Insured's life with all insurers may not exceed $350,000."  Both Leslie Brown, the Modern Woodmen underwriter who assessed Stephanie's insurance applications, and Judy McCoy, who was then Modern Woodmen's principal underwriter, confirmed this limitation.

Because Stephanie Mitchell already had $500,000 in accidental death coverage through American General, had she told Modern Woodmen that truth on the application, Modern Woodmen would not have issued the first insurance certificate providing $1 million in life coverage and $350,000 in accidental death coverage.  Modern Woodmen is therefore entitled to rescind the certificate based on this material misrepresentation.  *See Sovereign Camp v. Hutchinson*, 108 So. 520, 522 (Ala. 1926) ("A misrepresentation renders the policy void on the ground of fraud …").

49

    2.      The Half-Truth on the March 26, 2008 Application and Suppression/Concealment of the Truth that the Mitchells had Little or No Income

As a general matter, the amount of life insurance that a person may appropriately be issued depends on their income.  This is because, in plain terms, a person should not be worth more dead than alive.  Modern Woodmen's underwriting guidelines reflect this concept in an "income times factor" chart.  The underwriter takes an applicant's income and multiplies it by the factor listed in the chart to arrive at the maximum amount of insurance they may be issued with all insurers (absent some reason to deviate from the guideline).  For example, Stephanie Mitchell was 37 years old when she first applied to Modern Woodmen for insurance.  At that age, she qualified for life insurance with all insurers in the maximum amount of 25 times her annual income.

In light of this, Modern Woodmen's application asks the applicant their income and how much other insurance they have.  In response to the income question, Stephanie Mitchell stated only that she had a shared income, shared with her husband.  She did not tell Modern Woodmen that this shared income was zero or close to zero.  She did not tell Modern Woodmen that the family businesses where she worked and for whom she kept the books had income of only $4,521 the prior year and that they had started 2008 with less than $20,000 in inventory.  She suppressed and concealed the precarious financial condition she and her husband

were in despite agreeing with Modern Woodmen that "the statements and answers given in the application … are true, *complete* and correctly recorded." (emphasis added).

Stephanie Mitchell's representation that she had "shared income" with her husband was a misleading half-truth by which she suppressed and concealed the truth of her financial circumstances.  Insurers are entitled to more − they are entitled to candid answers to the questions on the insurance application.  And when they do not get candid answers regarding matters that are material to the underwriting, they are entitled to avoid the policy.  *See Duren v. Northwestern Life Ins. Co*., 581 So. 2d 810 (Ala. 1991); *Bankers Life & Cas. Co. v. Long*, 266 So. 2d 780 (Ala. App. 1972); Ala. Code § 6-5-102 ("Suppression of a material fact which the party is under an obligation to communicate constitutes fraud.").

*Bankers Life & Cas. Co. v. Long*, 266 So. 2d 780 (Ala. App. 1972) is instructive.  In that case, the insured represented on his insurance application that he was in good health.  He disclosed that he had been hospitalized once for hepatitis, but he did not disclose two other hospitalizations. The medical records reflected a diagnosis of cirrhosis, which was the cause of the insured's death.  The insurer denied coverage, and the beneficiary brought suit.  The beneficiary prevailed at the trial court level.

51

On appeal, the Alabama Court of Civil Appeals reversed, remanding the case for a new trial. The court cited an earlier Alabama decision, *Liberty Nat'l Life Ins. Co. v. Hale*, 230 So. 2d 526, 530 (Ala. 1970) to the effect that "'an insurance company is entitled to all material information bearing upon the obligation it undertakes in issuing a policy.'" *Bankers Life,* 266 So. 2d at 783.

Applying that law to the case before it, the *Bankers Life* court pointed to the fact that the insured had listed one hospitalization but had not listed two others. The court concluded that "[t]he withholding of this information is at best less than a candid and truthful answer to which the insurer was entitled under the laws of Alabama and the wording of the application." 266 So. 2d at 783.[8]

The *Duren* case is also illustrative. There, in response to health questions on the application, the insured disclosed that he had been treated for pneumonia and hospitalized for two days. He also disclosed that he was under observation or taking treatment for pneumonia. He denied having any disease of the lung, heart or chest pains or cancer. When the policy was delivered, he signed a statement to the effect that his health had not changed since the date of the application. When

---

[8] At the retrial of the case, the jury again found for the beneficiary. The Alabama Supreme Court affirmed. *See Bankers Life & Cas. Co. v. Long*, 345 So. 2d 1321 (Ala. 1977). It did so based on an exception to the general rule − that an insurer may not avoid the policy if it has "sufficient indications that would put a prudent person on notice so as to induce an inquiry which, if done with reasonable thoroughness, would reveal the truth." 345 So. 2d at 1323. That exception has no application here. No evidence suggests that Modern Woodmen had notice of facts which, if followed up with reasonable thoroughness, would have revealed that the Mitchells had little or no income.

the insured died of lung cancer a little more than a year later, the insurer denied

coverage, pointing to the insured's failure to disclose the severity of his lung

condition.

The trial court granted summary judgment to the insurer, and the Alabama

Supreme Court affirmed, explaining that "although it is unclear exactly what Mr.

Duren's doctors had told him before the application, it is clear that he knew his

lung condition involved more than pneumonia … Certainly, by the time he stated

in August that there had been no change in his health, he knew he had cancer."

581 So. 2d at 812.  *See also Old Southern Life Ins. Co. v. Spann*, 472 So. 2d 987,

989-90 (Ala. 1985)("An insurer has a right to expect applicants for insurance

policies to tell the truth. …Old Southern was entitled to raise [the insured's] failure

to mention [her psychiatric treatment] as a defense.").

Stephanie Mitchell suppressed and concealed from Modern Woodmen, when

responding to the income question on the March 26, 2008 application, that she and

her husband had little or no income.  Had she told the truth about that, it is certain

that no insurance would have been issued.  To illustrate the point, the Mitchells'

shared income for the entire year of 2007 was $4,521.  Assuming that half or even

all of that shared income was Stephanie's, the maximum amount of insurance she

would have qualified for, from all insurers, was $113,025 (income of $4,521 times

the factor listed in Modern Woodmen's underwriting chart of 25 equals $113,025).

She already had $510,000 in existing coverage and another $200,000 application

pending.  No insurer would have issued Stephanie Mitchell any life insurance had

she told the truth in response to the questions on the application about income and

other insurance.

Plaintiffs may suggest that Stephanie did not know just how bad things were

at the family businesses.  But she was the bookkeeper so she would know.  She

was also involved in sales at the lot.  She could look at the meager inventory they

had for sale.  She knew what prices they were asking for what little they had left.

Given her presence at and involvement in the businesses, she could not have

missed the fact that the businesses were almost out of business.  Certainly, she

knew that what little money the businesses were generating did  not justify the

issuance of millions of dollars in life insurance.

> 3.    Misrepresentations on the Face of the August 4, 2008
>        Application and the September 2, 2008 Statement of
>        Acceptance of Life Insurance

In her second Modern Woodmen application, made on August 4, 2008,

Stephanie Mitchell again misrepresented the truth.  She stated that she had no other

life insurance, she had no life insurance applications pending, she did not plan on

buying life insurance from another company and she had not been rejected for life

insurance.  On September 2, 2008, when she accepted Modern Woodmen

certificate No. 8248403, she misrepresented on the Statement of Acceptance of

Life Insurance Certificate that she had not applied for other life insurance since the date of her application.

As we have seen, Stephanie did, in fact, have lots of other life insurance. Depending on whether she knew on August 4, 2008, that American General had rejected her application, either she misrepresented that she had no other applications pending or she misrepresented that she had not had an application rejected. Further, while we cannot know for sure what she was thinking when she said on the application that she was not planning to buy life insurance from another company, she in fact sought another $1 million in life coverage and another $500,000 in accidental death coverage from Prudential a mere three days later, paying the initial premium. Shortly thereafter, she again applied for insurance from Stonebridge. The only reasonable conclusion that can be drawn from these facts is that Stephanie Mitchell planned to buy life insurance in whatever amounts she could get from whoever would issue it to her. And in making application to Modern Woodmen and to all the other insurers, she was far from candid when responding to the questions asked of her in the applications.

These misrepresentations regarding other coverage were material as a matter of law. With all the pending applications, even if the financial information stated in Tom's financial questionnaire had been true, Stephanie was, or would be with the issuance of the policies she had applied for (and not disclosed), overinsured.

There simply was no reason for the requested insurance even if the Mitchells had been the wealthy couple they looked like on paper.

Moreover, the Alabama Supreme Court has found  misrepresentations such as these material as a matter of law.  *Sovereign Camp, W.O.W. v. Young*, 186 So. 453 (Ala. 1939).  In *Young*, the insured misrepresented on his insurance application that he had not been rejected for life insurance.  In fact, only a few months earlier, he had applied for life insurance with another company and had been rejected.  Citing numerous authorities, the Alabama Supreme Court held "the false answer in his application to the inquiry as to a previous rejection for life insurance was material to the risk as a matter of law …." 186 So. at 456.

The *Young* court quoted extensively from *Cooley's Briefs on Insurance 2d* and from a Tennessee decision, *Mut. Life Ins. Co. v. Dibrell*, 194 S.W. 581, 582 (Tenn. 1917).  From *Cooley's,* the *Young* court quoted as follows:

> Among the questions invariably asked of the applicant for life insurance is whether he had ever applied to any other company for insurance and been rejected.  The purpose of the question is perhaps two-fold – to discover whether the risk has ever been regarded as unsafe by other insurers, and to show the applicant's anxiety for insurance. Whether the applicant has ever applied to other companies for insurance and been rejected is, therefore, regarded as material to the risk, and a statement in this regard whether made as a warranty or as a representation, will, if false, avoid the policy.

*Young*, 186 So. at 454 (quoting 4 Cooley's Briefs on Insurance, 2d ed., p. 3228).  *See also Dibrell*, 194 S.W. at 582 (quoted by the *Young* court at p. 455).

The undisputed facts show that Stephanie Mitchell was anxious about life insurance.  In the August 2008 time frame, when she applied to Modern Woodmen for another $1 million in life insurance, she was also applying for insurance from numerous other insurers, being rejected by some and accepted by others.  But she was careful in responding to the questions on the various applications not to let the insurers, including Modern Woodmen, know about her other insurance activity. She did not disclose the existence of her American General coverage to Modern Woodmen, nor did she disclose the pendency or decline of the application she had made to American General six weeks earlier.  She did not disclose  the existence of her American General coverage when applying to Prudential.  Just as in *Young*, these misrepresentations were material as a matter of law.  Not only would truthful and candid answers have permitted the insurers to determine that she was overinsured and to inquire about the rejection of her American General application, they would have revealed the material fact that she was anxious about insurance.

4.     The Half-Truth On the August 4, 2008 Application and Suppression/Concealment of the Truth that the Mitchells had No Income

Modern Woodmen addressed earlier Stephanie Mitchell's half-truth, suppression and concealment regarding the income she shared with her husband (or more accurately, the lack thereof) with respect to the first certificate and will not repeat that argument here.  Modern Woodmen would add only that by the time

of the second application, August 4, 2008, the Mitchells' financial situation was desperate.  They had not sold a car or boat in months.  They had, at most, a few thousand dollars of inventory left to sell, and more likely, none at all.  The businesses where Stephanie claimed to work as the bookkeeper were out of business.  Tom 's federal income tax return for that year shows a negative income, both for the businesses (on Schedule C) and personally.  And yet, instead of disclosing the truth to Modern Woodmen when it asked about her income, she directed the company to Tom's financial questionnaire.  Because Stephanie did not tell Modern Woodmen the truth about her income –that she and her husband had none – Modern Woodmen, as a matter of law, is entitled to rescind the certificates.

C.      Modern Woodmen Was Entitled to Rely on the Misrepresentations in Tom's Financial Questionnaire in Rescinding the Certificates.

The certificates issued by Modern Woodmen on the life of Stephanie Mitchell were form certificates.  The form includes the following provisions:

> This certificate was issued based on the answers in the application.  If all answers are not true and complete, insurance benefits may be affected.

*See* Ex. 2 to Ex. N, ES 0282; Ex. 4 to Ex. N, ES 0310.

> The Society issued this certificate in consideration of the first premium and the statements in the application.

> The Society relies on statements made in the application for this certificate.

> No statement will void this certificate or be used in defense of a claim unless: a) it is contained in the application; and b) such application is attached to this certificate.

*See* Ex. 2 to Ex. N, ES 0290; Ex. 4 to Ex. N, ES 0318.

> AGREEMENT: To the best of my knowledge and belief, the statements and answers given in this application, consisting of six pages, are true, complete, and correctly recorded.

*Id.*, ES 0288, ES 0316.

Insurance policies are contracts.  Like other contracts, they are to be "construed so as to give effect to the intentions of the parties…" *Celtic Life Ins. Co. v. McLendon*, 814 So. 2d 222, 224 (Ala. 2001).

 In this instance, the quoted form provisions not only do not reflect the contracting parties' intent, they are inconsistent with that clear intent.  The form provisions state, in multiple places, that the answers given on the application itself are complete even though it is undisputed that both Modern Woodmen and Stephanie Mitchell knew that they were not complete.  Similarly, the form provisions state, in several places, that the certificates were to be issued based on the statements in the applications, and yet both contracting parties knew and intended that Tom Mitchell's Financial Form 186 would be used in underwriting the certificates.

Here, the contracting parties agreed to depart from the form language of the certificates.  Stephanie Mitchell asked Modern Woodmen to rely on the statements

made in her husband's financial questionnaire, and Modern Woodmen did so.
That was the parties' clear intent and thus their agreement.

The Alabama Supreme Court addressed a similar situation in *Massachusetts Mut. Life Ins. Co. v. Crenshaw*, 65 So. 65 (Ala. 1914).  There, the form policy included language substantially similar to that found in Modern Woodmen's certificates, reading as follows: "'This policy and the application herefor constitute the entire contract between the parties.  All statements made by the applicant shall, in the absence of fraud, be deemed representations and not warranties, and no such statement shall be used in defense of a claim under this policy unless it is contained in the application and a copy of the application is hereto annexed.'" 65 So. at 66.

In defending against a suit on the policy, the insurer in *Crenshaw* sought to rely on misrepresentations made in a good health statement signed by the applicant when the policy was delivered – it was not part of the application and was not attached to the policy.  Pointing to the provision quoted above, the beneficiary argued that the policy itself precluded the insurer from relying on the same.

The *Crenshaw* court held that, notwithstanding the provision in the policy, the insurer was entitled to defend based on the insured's misrepresentations in the good health statement.  The court explained that the application and policy "manifestly contemplated a delivery subsequent to, even, the acceptance and approval of the application" so that "[o]bviously, it was not the intent of the

provision first quoted before to restrict the basis for fraud to conditions prevailing at the time the application was made; since misrepresentations possible of utterance subsequent thereto only could not, of necessity have been incorporated in the application." 65 So. at 67.

The *Crenshaw* case is much like this one. As in that case, Stephanie Mitchell's application itself not only contemplated but directed that information not stated therein, specifically Tom Mitchell's financial questionnaire, be relied on in issuing the certificates. Just as in *Crenshaw*, Modern Woodmen is entitled to defend this action based on misrepresentations made in that questionnaire.

Another useful case on this point is *Sovereign Camp, W.O.W. v. Thompson*, 174 So. 761 (Ala. 1937). There, the form insurance certificate provided that it was null and void unless delivered and accepted within 45 days after issue. The certificate was issued in October but not delivered until the following January. In the interim, the insurer wrote to the applicant encouraging him to accept the certificate, and he did so. After the insured's death, the insurer took the position, based on that policy provision, that the insurance certificate was null and void. Rather than enforce the certificate as written, the court honored the clear intent of the parties, holding that the insurer had waived or was estopped from relying on the provision. *See also General Ins. Co. v. Killen*, 120 So. 887, 893 (Ala. 1960) ("It has long been held that with respect to a contract of insurance as with other

contracts, the parties thereto may at their pleasure alter, modify or rescind the contract, so long as the same is supported by their mutual assent …”).

As in *Thompson*, the undisputed facts show that Stephanie Mitchell and Modern Woodmen contracted for something different than was stated in the form contract.  Their clear intent was that the certificates be issued based on both the answers given in the application and the shared income shown on the financial questionnaire provided by her husband.  That was the agreed basis for the contract and, correspondingly, the agreed basis for any defense of a claim.  Because of the misrepresentations made both in the applications and in the financial questionnaire, Modern Woodmen has no obligation to pay benefits under the certificates.

> D.   Modern Woodmen Was Entitled to Rely on the Misrepresentations in the Reliable Reporting Interviews in Rescinding the Certificates.

Finally, Modern Woodmen was entitled to rely on the Reliable Reporting interviews both in underwriting the certificates and in rescinding them.  While the “Entire Contract” provision in the certificates, if considered alone, would seem to preclude that use, a provision in the application portion of the certificate authorizes it.  In the application, Stephanie Mitchell authorized Modern Woodmen to obtain a broad range of information from “any person or entity” and to use that information both in underwriting the application and in determining eligibility for benefits.  The provision specifically states: “**Use and Disclosure** – I understand that the information obtained by use of this Authorization will be used by Modern

Woodmen of America to determine eligibility for insurance coverage or for benefits thereunder for myself and for any child proposed for coverage." Thus, despite the language relied on by Plaintiffs, elsewhere in the certificate, the parties expressly agreed that Modern Woodmen would be entitled to use the information gathered in determining eligibility for benefits.  Consequently, Modern Woodmen was entitled to use the Reliable Reporting interviews, which contain yet more misrepresentations made by Stephanie Mitchell, to avoid coverage under the certificates.

The inescapable truth here is that Stephanie Mitchell was not candid with Modern Woodmen when applying for insurance coverage – far from it!  Insurers are entitled to the truth from potential insureds, and when they do not get it, the law permits them to rescind.  Modern Woodmen is entitled to do so here.

> E.     Plaintiffs' Bad Faith Claim Fails as a Matter of Law.

Just as Modern Woodmen is entitled to judgment as a matter of law on the contract claims, it is entitled to judgment as a matter of law on the bad faith claim.[9] When the Alabama Supreme Court recognized a claim for bad faith, "it anticipated that such claims would be rare."  *United Ins. Co. of America v. Cope*, 630 So. 2d 407, 412 (Ala. 1993).  Proof of mere negligence or a mistake on the part of an

---

[9] Plaintiffs' Complaint alleges an "intentional refus[al] to pay these claims or interplead their proceeds."  Complaint, ¶ 24.  Our courts have not recognized a claim for bad faith failure to interplead.

63

insurer is not sufficient to support a claim for bad faith under Alabama law.  *See Davis v. Cotton States Mut. Ins. Co.*, 604 So. 2d 358, 359 (Ala. 1992);  *King v. National Found. Life Ins. Co.*, 541 So. 2d 502, 505 (Ala. 1989).  The Alabama Supreme Court has explained that  "[b]ad faith . . . is not simply bad judgment or negligence.  It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will."  *Singleton v. State Farm Fire & Casualty Co.*, 928 So. 2d 280, 283 (Ala. 2005) quoting *State Farm Fire & Casualty Co. v. Slade*, 747 So. 2d 293, 303-04 (Ala. 1999)).

To prevail on a theory of bad faith, Plaintiffs must first prove that they are "entitled to a directed verdict on the insurance contract . . ."  *Union Bankers Ins. Co. v. McMinn*, 541 So. 2d 494, 497 (Ala. 1989).  Then, they must prove an intentional refusal to pay the claim by the insurer without an arguable basis to do so.  *National Security Fire & Casualty Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982).  Plaintiffs further must produce substantial evidence that the refusal was deliberate, coupled with a <u>conscious intent to injure the insured</u>.  *Davis*, 604 So. 2d at 359.  Here, Plaintiffs cannot show any of these required elements.

      1.    Plaintiffs would not be Entitled to a Directed Verdict on the Breach of Contract Claim.

A plaintiff in a normal bad faith case "must be entitled to a directed verdict on the insurance contract in order to be able to recover for bad faith."  *McMinn*,

541 So. 2d at 497.  Plaintiffs here certainly will not be entitled to a directed verdict on the breach of contract claims.  To the contrary, as shown above, Modern Woodmen is entitled to summary judgment on those claims based on Stephanie Mitchell's misstatements, concealment and omissions in the insurance applications and acceptance certificate.  Because Plaintiffs cannot prevail on the breach of contract claims as a matter of law, the bad faith claim necessarily fails as well.  *See Old Southern Life Ins. Co., Inc. v. Spann*, 472 So. 2d 987, 989 (Ala. 1985) (holding that insurer was entitled to judgment in its favor on bad faith claim where insured could not prevail as a matter of law against insurer's denial).

> 2.   There is No Evidence that Modern Woodmen Intentionally and Without a Legitimate or Arguable Reason Refused to Pay Plaintiffs' Claim.

Even if Plaintiffs could overcome the breach of contract hurdle (and the evidence is clear that they cannot), Modern Woodmen is nonetheless entitled to summary judgment on the bad faith claim because Plaintiffs cannot produce substantial evidence of the elements of such a claim, which are:

> (a) an insurance contract between the parties and a breach thereof by the defendant;
>
> (b) an intentional refusal to pay the insured's claim;
>
> (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
>
> (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;

(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*Bowen*, 417 So. 2d at 183.

A debatable reason under (c) above means "an arguable reason, one that is open to dispute or question." *Id*. The Alabama Supreme Court has consistently held that the plaintiff in a bad faith case bears a "heavy" burden, and that "if any one of the reasons for denial of coverage is at least 'arguable,' [the] Court need not look any further." *Gillion v. Alabama Forestry Ass'n*, 597 So. 2d 1315, 1320-21 (Ala. 1992) (quoting *McLaughlin v. Alabama Farm Area Mutual Casualty Corp.*, 437 So. 2d 86, 91 (Ala. 1983)).

Modern Woodmen denied Plaintiffs' claim for death benefits for good reason. When applying for the insurance, Stephanie Mitchell misrepresented, suppressed and concealed the truth about her other life and accidental death insurance and her and her husband's income. Because Stephanie Mitchell was not candid and truthful on her applications and when accepting the second certificate, Modern Woodmen's denial, at a minimum, was for "arguable" or "debatable" reasons. And of course, there is no evidence that Modern Woodmen knew, when it denied the claim, that its reasons for doing so were not arguable or debatable.

3.    There is No Evidence that Modern Woodmen Acted with an Intent to Injure Stephanie Mitchell.

Under Alabama law, a plaintiff alleging bad faith must produce substantial evidence not only that there was no arguable or debatable reason for the intentional refusal to pay <u>and</u> that the insurer knew of the absence of such a reason at the time of the denial, but also must produce substantial evidence that such a refusal was deliberate, coupled with a <u>conscious intent to injure the insured</u>.  *Davis*, 604 So. 2d at 359; *King*, 541 So. 2d at 502; *Coleman v. Gulf Life Ins. Co.*, 514 So. 2d 944 (Ala. 1987); *Blue Cross and Blue Shield of Alabama v. Granger*, 461 So. 2d 1320 (Ala. 1984).  Summary judgment for the insurer is proper where the insured fails to produce substantial evidence of the requisite intent to injure on the part of the insurer.  *See Harrington v. Guaranty Nat'l Ins. Co.,* 628 So. 2d 323, 326-27 (Ala. 1993) (affirming summary judgment in favor of insurer on bad faith claim because of lack of evidence of intent to injure even though insurer's denial was incorrect).

Plaintiffs have not and cannot possibly produce any evidence showing that Modern Woodmen acted with a conscious intent to injure Stephanie Mitchell.  On the contrary, Modern Woodmen simply acted according to the terms of the contract.  The absence of such evidence presents yet another reason why Modern Woodmen is entitled to summary judgment on the bad faith claim.

4. Plaintiffs' "Abnormal" Bad Faith Claim Fails as a Matter of law.

Plaintiffs' second theory of bad faith—"abnormal" bad faith —fails just as their first theory does.  Plaintiffs allege that Modern Woodmen "intentionally failed to determine whether or not there was any lawful basis for its refusal to pay these claims."  Complaint, ¶ 24.  Under Alabama law, the primary consideration in an "abnormal" bad faith claim is "whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review."  *Gulf Coast Atlantic Life Ins. Co.*, 405 So.2d at 924.

Plaintiffs cannot possibly meet this standard.  Liability for abnormal bad faith does not attach where, as here, Modern Woodmen conducted a thorough investigation of the claim.  *See Weaver v. Allstate Ins. Co*., 574 So. 2d 771, 774 (Ala. 1990) ("With regard to [the] allegation that Allstate intentionally failed to adequately investigate the accident . . . we hold that Allstate's investigation established a legitimate or arguable reason for refusing to pay [plaintiff's] claim, which is all that is required"); *State Farm Mut. Auto Ins. Co. v. Smith*, 956 So. 2d at 1167 (reversing jury verdict claim of bad faith where evidence showed insurance company investigated claim before denying it); *Preis v. Lexington Ins. Co*., 508 F. Supp. 2d at 1078 ("The plaintiffs have not articulated how the adjuster's investigation, or Lexington's reliance on it, constitutes a failure to investigate for purposes of Alabama's bad faith law").  In addition, Plaintiffs have not shown that additional investigation by Modern Woodmen would have resulted in a different

claim outcome.  *See State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 318 (Ala. 1999) ("Practically, the effect is that in order to prove a bad-faith-failure to investigate claim, the insured must prove a proper investigation would have revealed that the insured's loss was covered.").

Here, Modern Woodmen hired Altima Informational Services, Inc. ("Altima"), an investigatory service, three days after Stephanie Mitchell's death to interview Tom Mitchell, obtain authorizations and gather records.  *See* Gackle Decl., Ex. N, ES, 0276-78.  Within two weeks, Altima had forwarded authorizations to Tom Mitchell for his signature so it could obtain medical records from Stephanie Mitchell's health care providers.  *Id*.  Over three months passed with no response from Tom Mitchell, so Altima re-sent the required authorizations to him in July 2009.  *Id*.  Tom Mitchell finally submitted the signed authorizations to Altima in September 2009.  *Id*.

Following the filing of the Complaint, Modern Woodmen served Tom Mitchell and Brittany Allred with its first set of discovery requests, including eighteen requests for production.  *See* First Set of Discovery Requests, Ex. KK, ES 0766-0775.  Modern Woodmen requested tax returns, documents reflecting income Stephanie Mitchell or her husband had earned, documents relating to applications and policies for life insurance, financial documents, documents reflecting loans and mortgages, and Stephanie's medical records.  *Id*.  In response

to Modern Woodmen's requests for production, Tom Mitchell and Brittany Allred produced approximately 1440 pages of documents.  *See* August 30, 2010 Letter from Joel Dillard, attached as Ex. MM.  However, they produced less than 85 pages that were not a reproduction of documents that American General had produced to them.  *Id*.  Modern Woodmen served Tom Mitchell and Brittany Allred with sixteen additional requests for production in this lawsuit.  *See* Second, Third, and Fourth Sets of Discovery Requests, Ex. NN, ES.  They produced thirty-six additional pages of documents.  *Id*.

Forced to find another way to gather relevant documents, Modern Woodmen issued over sixty-five subpoenas to various third-parties and received over nine thousand pages of documents.  *See* Doc. 82, p. 2.

Plaintiffs' abnormal bad faith claim focuses on Modern Woodmen's investigation and evaluation of the evidence.  Modern Woodmen did not ignore any evidence.  Modern Woodmen's claim determination was based on its consideration and evaluation of the totality of the evidence and Alabama law.  The fact that Plaintiffs do not like the outcome of Modern Woodmen's investigation does not change the fact that the evidence was subjected to a cognitive evaluation and review.  Modern Woodmen has a responsibility to pay valid claims and to deny invalid claims.  Plaintiffs' claims fall in the latter category.

<u>CONCLUSION</u>

Based on the foregoing, Modern Woodmen respectfully submits that it is entitled to summary judgment in its favor on all claims alleged in the Complaint and on its Counterclaim seeking a declaration regarding whether it is obligated to pay benefits under the two insurance certificates it issued on the life of Stephanie Mitchell.

Dated this the 31st day of May, 2013.


/s/ Sara A. Ford
One of the Attorneys for Defendant Modern
Woodmen of America


OF COUNSEL:
Sara Anne Ford (FORDS5509)
*sford@lightfootlaw.com*
Brooke G. Malcom (malc4694)
*bmalcom@lightfootlaw.com*
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203
Telephone (205) 581-0700
Facsimile: (205) 581-0799

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 31st day of May, 2013, a true and correct copy

of the foregoing was served on the following counsel of record by via CM/ECF:

Joel E. Dillard, Randy James, and Elizabeth W. McElroy
Baxley, Dillard, Dauphin, McKnight & James
2008 Third Avenue South
Birmingham, Alabama  35233

Richard E. Smith, Daniel D. Sparks, and Jeremy L. Carlson
Christian & Small, LLP
505 20th Street North, Suite 1800 Financial Center
Birmingham, Alabama  35203-2696

<u>/s/ Sara A. Ford</u>
OF COUNSEL