FILED

2014 Dec-10  PM 03:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **DERRICK MITCHELL, as the** | ) | |
| **Personal Representative of the Estate** | ) | |
| **of Tom James Mitchell, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 2:10-cv-00965-JEO** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MODERN WOODMEN OF** | ) | |
| **AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case involves two insurance certificates issued by Modern Woodmen of America on the life of Stephanie Mitchell in 2008, the first providing $1 million in life insurance coverage and $350,000 in accidental death coverage, and the second providing an additional $1 million in life insurance coverage.  In March 2009, less than a year after Modern Woodmen issued the certificates, Stephanie Mitchell died from gunshot wounds to the head.  Her death was ruled a homicide.

Tom Mitchell, Stephanie's husband, was the principal beneficiary of both insurance certificates.   In May 2009, he submitted a claim to Modern Woodmen for benefits under both certificates.  Because Stephanie's death occurred within two years of the issuance of the certificates, Modern Woodmen conducted a claim review.  After nearly a year passed with no payment of the claim, Tom Mitchell and Brittany Allred, the contingent beneficiary of both certificates, filed this action against Modern Woodmen for breach of the insurance certificates

and for bad-faith refusal to pay the claim for benefits.[1] (Docs. 1, 4).[2]  Modern Woodmen

answered the complaint and asserted a counterclaim seeking a declaratory judgment as to

whether benefits are payable under either certificate and, if so, to whom the benefits are owed.

(Docs. 12, 29).

In February 2012, after nearly two years of litigation, Modern Woodmen formally denied

Tom Mitchell's claim for benefits based on Stephanie Mitchell's alleged failure to give "accurate

and complete" answers to the questions on her insurance applications.  Fifteen months later,

Modern Woodmen issued a second denial citing additional alleged "material misrepresentations"

by Stephanie Mitchell.

This action is now before the court on three motions: (1) Plaintiffs' motion for summary

judgment in their favor on their claims against Modern Woodmen for breach of the insurance

certificates (doc. 83); (2) Modern Woodmen's motion for summary judgment in its favor on all

of the claims in Plaintiffs' complaint and on its counterclaim for a declaratory judgment as to

whether benefits are payable under the insurance certificates (doc. 86); and (3) Plaintiffs' motion

to strike the Declaration of Judy McCoy, which Modern Woodmen submitted in support of its

motion for summary judgment. (Doc. 104)  For the reasons set forth below, the court concludes

that Plaintiffs' motion for summary judgment is due to be denied and that Modern Woodmen's

motion for summary judgment is due to be denied in part and granted in part.  Because the court

---

[1]Tom Mitchell is now deceased.  The representatives of his estate have been substituted as plaintiffs in his place.  In addition, Tristan Allred and Ryan Allred, who also claim to be entitled to benefits under the insurance certificates, have been added as additional plaintiffs.

[2]References to "Doc. __" are to the document number assigned by the clerk of the court in the court file.

2

is able to rule on the motions for summary judgment without considering the Declaration of Judy McCoy, Plaintiffs' motion to strike the declaration will be denied as moot.

I.    **FACTS**[3]

    **A.    Tom Mitchell's Businesses**

Tom Mitchell owned and operated two businesses.  He sold cars under the name "Mitchell Motors" and boats under the name "Mitchell Marine." (Doc. 86 at ¶ 11).  Neither business was incorporated. (Doc. 86 at ¶ 15).

Tom Mitchell considered Stephanie Mitchell to be his partner in the two businesses. (Doc. 86 at ¶ 12).  Stephanie kept the books for both businesses and handled the paperwork, including tax papers and bills of sale. (*Id.*)  She also assisted in sales. (*Id.*)

Because Mitchell Motors and Mitchell Marine were not incorporated, their income and expenses were reflected on Schedule C (Profit or Loss from Business) of Tom Mitchell's federal tax returns. (Doc. 86 at ¶ 15).  His 2007 Schedule C reflects an income of $4,521 for the year. (*Id.*)  It further reflects an ending inventory for the year of $2,500. (Doc. 86 at ¶¶ 14 -15).

Tom Mitchell filed monthly sales tax returns throughout 2008.  The returns for June through November reflect sales of zero dollars.  (Doc. 86 at ¶ 48).  The November return notes that Mitchell Marine closed on November 30, 2008.  (*Id.*)

Schedule C of Tom Mitchell's 2008 federal tax return shows a beginning inventory of $16,500 and an ending inventory of zero dollars. (Doc. 86 at ¶ 50).  The return also reflects that

---

[3] These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

the cost of goods sold during the year was $16,500, such that there was no gross profit and no income. (*Id.*)  Plaintiffs admit that Tom Mitchell's sales tax returns reported this information, but they note that Tom Mitchell operated on a cash system and contend that the tax returns are not dispositive of his inventory's value or his sales. (Doc. 95 at ¶ 50).

B.    **Tom Mitchell's Financial Form**

On February 21, 2008, Tom Mitchell applied for $1 million in life insurance from Modern Woodmen. (Doc. 86 at ¶ 21).  In connection with his application he submitted a financial form in which he represented that he had salary or wages of $280,000 in 2007 and salary or wages of $40,000 to $50,000 year to date. (Doc. 87-39 at 8)  He further represented that he had net business or professional income of $60,000 to $70,000 in 2007 and that his net worth was $3,150,000. (*Id.*).

C.    **Stephanie Mitchell's First Modern Woodmen Insurance Certificate**

On March 26, 2008, Stephanie Mitchell met with Laura Williams, a Modern Woodmen agent, and applied for $1 million in life insurance coverage and $350,000 in accidental death coverage. (Doc. 87-39 at 26-32).  At that time she already had $510,000 in life insurance coverage and $500,000 in accidental death coverage with American General Life & Accident Insurance Company. (Doc. 86 at ¶¶ 3-8, 24; Doc. 101-28).  She also had a pending application with American General for an additional $200,000 in life insurance coverage. (Doc. 86 at ¶ 24).

Under the financial underwriting guidelines utilized by Modern Woodmen, the maximum amount of life insurance an applicant is generally eligible for depends on his or her age and earned income. (Doc. 88-2 at ES0677).[4]  Based on her age, Stephanie would have qualified for a

---

[4]Doc. 88-2 was filed under seal.

4

total line of life insurance equal to her annual earned income multiplied by a factor of 25. (*Id.*; Doc. 87-53 at 6). Modern Woodmen also allows a non-working spouse to receive an amount of life insurance coverage equal to the coverage in force on the working spouse. (Doc. 101-1 at ESRS 000007).[5] The written guideline provides that the maximum amount of coverage that can be issued to the non-working spouse is $500,000 to $1 million (*id.*); Leslie Brown, the Modern Woodmen underwriter who underwrote Stephanie Mitchell's application, testified that Modern Woodmen does not apply that limitation. (Doc. 97-11 at 21). Finally, it is Modern Woodmen's policy that the total amount of accidental death coverage on an insured's life with all insurers may not exceed $350,000. (Doc. 88-2 at ES0679).

In response to the questions on the Modern Woodmen insurance application concerning "non-medical" information, Stephanie Mitchell stated that she was employed by Mitchell Marine, that her occupation was secretary/housewife, that she kept the books for her husband's businesses, and that she had a "shared income" with her husband. (Doc. 87-39 at 29). The amount of the shared income was not reflected on the application. (*Id.*) Stephanie further stated that she had a total of $200,000 in life insurance in force with other companies and no accidental death insurance. (*Id.*) She stated that she did not have an application for life insurance pending with another company and was not planning on purchasing life insurance with another company. (*Id.*)

The Modern Woodmen application contained a provision (the "Authorization") pursuant to which Stephanie Mitchell authorized third-parties to give and disclose to Modern Woodmen information relating to her "age, occupation, physical condition, prescription authorization,

---

[5]Doc. 101-1 was filed under seal.

health history, ... character, general reputation, personal characteristics, motor vehicle report, hobbies and mode of living." (Doc. 87-39 at 32).  As part of the Authorization, Stephanie acknowledged her understanding that "the information obtained by use of this Authorization will be used by Modern Woodmen ... to determine eligibility for insurance coverage or for benefits." (*Id.*)  In a separate section of the application, Stephanie also acknowledged her understanding that "I might be personally interviewed if an Investigative Consumer Report is prepared in connection with this application." (*Id.* at 31)

When she signed her completed application, Stephanie Mitchell confirmed that she had reviewed her answers before signing it. (*Id.* at 32).  She also agreed that, to the best of her knowledge and belief, the statements and answers in the application were "true, complete, and correctly recorded." (*Id.* at 31).  She acknowledged that the statements and answers in the application would be the basis for any insurance issued on the application. (*Id.*)

Laura Williams completed an Agent's Report as part of the application process. (*See* Doc. 87-39 at 36).  In her report, Williams noted: "[Stephanie] works with her husband ... and her financial questionnaire will be the same as his.  If needed, I can get one although she doesn't draw a salary from their businesses." (*Id.*)

 On April 9, 2008, Reliable Reporting Services conducted a telephone interview of Stephanie Mitchell in connection with her pending insurance application with Modern Woodmen. (*See* Doc. 87-49 at 5-7).  As reported by Reliable Reporting, Stephanie said that she was a co-owner of Mitchell Marine and Mitchell Motors and that she performed managerial duties for the companies and worked over 40 hours per week. (Doc. 87-49 at 5).  Reliable Reporting listed her salary as $70,000+ and her husband's income as $80,000+. (*Id.* at 7).

According to Reliable Reporting, Stephanie said she had a "small" insurance policy that she was keeping but did not recall the amount of the policy or the name of the insurance company. (*Id.*)

On April 22, 2008, Modern Woodmen issued Certificate No. 8227615 (the "First Certificate") insuring Stephanie Mitchell's life in the amount of $1 million and providing $350,000 in accidental death coverage. (Doc. 87-39 at 10-34). Stephanie's husband, Tom Mitchell, had $3 million in life insurance coverage with Modern Woodmen at that time. (Doc. 95 at 20, ¶ 12). Leslie Brown, the Modern Woodmen underwriter who underwrote Stephanie's application, has stated that she relied on the application, Tom Mitchell's financial form, the Reliable Reporting interview summary, the Agent's Report, and other documents in issuing the First Certificate.[6] (Doc. 87-64 at ¶¶ 3-4).

The cover page of the First Certificate provides: "This certificate was issued based upon the answers on the application. If all answers are not true and complete, insurance benefits may be affected." (Doc. 87-39 at 10). The First Certificate also contains an "Entire Contract" provision that states as follows:

> This certificate is a legal contract. The Society [Modern Woodmen] issued this certificate in consideration of the first premium and the statements in the application. The entire contract consists of:
>
> a) this certificate;
>
> b) any endorsements or additional benefit riders;
>
> c) the attached copy of the application;
>
> d) any amendments, supplemental applications or other attached papers; and

---

[6]Plaintiffs have noted that Modern Woodmen also obtained a credit report on Stephanie Mitchell. (Doc. 95 at 11; Doc. 97-10 at 25-26).

e) the Articles of Incorporation and By-Laws of the Society and any amendments thereto made after the date of issue which will govern and control this certificate, provided however, no such amendment will reduce the benefits the Society contracted to give as of the date of issue.

The Society relies on statements made in the application for this certificate.  These statements are deemed representations and not warranties except in the case of fraud.  **No statement will void this certificate or be used in defense of a claim unless:**

**a)  it is contained in the application; and**

**b)  such application is attached to this certificate.**

Only the National Secretary of the Society can modify this contract or waive any of the Society's rights or requirements.

(*Id.* at 18) (emphasis added).

### D.      Stephanie Mitchell's Second Modern Woodmen Insurance Certificate

On August 4, 2008, Stephanie Mitchell met with Laura Williams, Modern Woodmen's agent, and applied for an additional $1 million in life insurance coverage. (Doc. 87-39 at 52-58). By that time she had a total of $710,000 in life insurance coverage and $500,000 in accidental death coverage with American General, in addition to her existing life insurance and accidental death coverage with Modern Woodmen. (Doc. 86 at ¶ 89).

Two months earlier, Stephanie Mitchell had also applied for an additional $1 million in life insurance coverage from American General. (*Id.*)  On August 1, 2008, American General made the initial decision to decline the application. (Doc. 87-1 at 89).  It is not known whether Stephanie was aware that her American General application had been declined when she submitted her second application to Modern Woodmen on August 4, 2014.

In response to the "non-medical" questions on her second Modern Woodmen application,

8

Stephanie Mitchell said that she was a housewife, that she worked with her husband, and that she kept the books for her husband's businesses. (Doc. 87-39 at 55). She answered "no" to the following questions: "Have you applied for life insurance that is currently pending or are you planning on purchasing life insurance with another company?" and "Have you had life or health insurance rejected, rated, postponed, modified, or cancelled?" (*Id.*) Next to the question regarding annual income, Laura Williams (who filled out the application) wrote "check on Tom James Mitchell Financial Form 186." (*Id.*) The questions regarding total amount of life insurance and total amount of accidental death benefits in force with other (external) companies were left blank. (*Id.*)

Stephanie Mitchell's second application contained the same Authorization as her first application and the same acknowledgment that the information obtained through the Authorization would be used by Modern Woodmen to determine eligibility for insurance coverage and benefits. (Doc. 87-39 at 58). It also contained the same acknowledgment that she might be personally interviewed if an Investigative Consumer Report was prepared. (*Id.* at 57). As before, when Stephanie signed her completed application, she confirmed that she had reviewed the answers in the application before signing it. (*Id.* at 58). She again acknowledged that, to the best of her knowledge and belief, the statements and answers in the application were "true, complete, and correctly recorded" and that the statements and answers would be the basis for any insurance issued on the application. (*Id.* at 57)

On August 7, 2008, three days after submitting her application to Modern Woodmen, Stephanie Mitchell applied for $1 million in life insurance coverage and $500,000 in accidental death coverage from Prudential Life Insurance Company. (Doc. 86 at ¶ 71).

On August 13, 2008, Reliable Reporting Services conducted a telephone interview of Stephanie Mitchell regarding her second application to Modern Woodmen. (Doc. 87-49 at 8-10). As reported by Reliable Reporting, Stephanie again said that she worked for Mitchell Marine and Mitchell Motors, that she was a co-owner of the businesses, and that she engaged in managerial duties and worked over 40 hours per week. (*Id.* at 8).  Reliable Reporting listed Stephanie's salary as $240,000 and reported that she was updating her "MWA" insurance, which she was keeping. (*Id.* at 10).

The next day, Stonebridge Life Insurance Company issued a $100,000 accidental death and dismemberment policy to Stephanie Mitchell. (Doc. 87-67 at 2-9).

On August 26, 2008, Modern Woodmen issued Certificate No. 8248403 (the "Second Certificate") insuring Stephanie Mitchell's life in the amount of $1 million. (Doc. 87-39 at 38-60).  Tom Mitchell still had $3 million in life insurance coverage with Modern Woodmen when Stephanie's Second Certificate was issued. (Doc. 95 at 20, ¶ 3).  As before, Leslie Brown underwrote Stephanie's second application. (Doc. 87-64 at ¶ 7). She has represented that she relied on the application and Tom Mitchell's financial form in deciding to issue the Second Certificate. (*Id.* at ¶ 8).  Plaintiffs dispute Brown's representation, and point out that Tom Mitchell's financial form was not contained in Stephanie Mitchell's underwriting file. (Doc. 95 at 21, ¶ 8).

The Second Certificate contains the same standard provisions as the First Certificate.  In particular, it contains the same statement on the cover page that "[i]f all answers [on the application] are not true and complete, insurance benefits may be affected." (Doc. 87-39 at 38). It also contains an identical Entire Contract provision identifying the documents that make up the

10

contract and providing that "[n]o statement will void this certificate or be used in the defense of a claim unless ... it is contained in the application; and ... such application is attached to this certificate." (*Id.* at 46).

On August 28, 2008, American General issued a $1 million life insurance policy to Stephanie Mitchell. (Doc. 86 at ¶ 75; Doc. 87-68). With the addition of that policy, Stephanie had a total of $1.71 million in life insurance coverage with American General, along with $500,000 in accidental death coverage. (Doc. 86 at ¶¶ 75, 89).

Modern Woodmen delivered the Second Certificate to Stephanie Mitchell on September 2, 2008. (Doc.86 at ¶ 76). Upon delivery, Stephanie signed a Statement of Insurability in which she represented that "since the earliest of the date of the application and the dates of all medical examinations required by Modern Woodmen of America for this life insurance certificate, no person proposed for insurance has ... [a]pplied for other life or health insurance, or for reinstatement which was declined or issued other than applied for, or had renewal refused." (Doc. 87-39 at 63). Ten days later Prudential denied her pending application for $1 million in life insurance and $500,000 in accidental death coverage. (Doc. 86 at ¶ 93; Doc. 87-76).

### E.   Modern Woodmen's Investigation and Denial of Claim

On March 28, 2009, Stephanie Mitchell died from gunshot wounds to the head; her death was ruled a homicide. (Doc. 86 at ¶ 77). Because her death occurred within two years of the issuance of the First and Second Certificates, Modern Woodmen conducted a claim review. (Doc. 86 at ¶ 78). As part of that review, Modern Woodmen hired Altima Informational Services, Inc., to interview the beneficiary, obtain authorizations, and gather records. (*Id.*) Later, after Tom Mitchell and Brittany Allred filed this action on April 14, 2010, Modern Woodmen

11

served them with interrogatories and requests for production seeking, among other documents,

tax returns, documents reflecting Stephanie Mitchell's income, documents relating to

applications and policies for life insurance, bank account records, and medical records. (*Id.* at ¶¶

83, 86).  Modern Woodmen also served subpoenas on numerous third parties, including health

care providers, other insurance companies, and financial companies. (*Id.* at ¶ 87).

By letter dated February 29, 2012, Modern Woodmen informed Tom Mitchell of the

information it had obtained during its claim review and its denial of coverage under the First and

Second Certificates. (Doc. 86 at ¶ 101; Doc. 87-39 at 65-66).  In the letter, Modern Woodmen set

forth its reasons for denial as follows:

> [W]hen Ms.[Stephanie] Mitchell signed the [first] application dated March 26,
> 2008, she had $510,000 of insurance in force and $300,000 of Accidental Death
> Benefit in force with another insurance company.  On the application to Modern
> Woodmen, she stated she had $200,000 of insurance in force and no Accidental
> Death Benefit.  In a telephone interview, Ms. Mitchell stated her annual salary
> was $70,000+ and her spouse's annual income was $80,000+, and their assets
> were $2,200,000.
>
> On her [second] application for insurance dated August 4, 2008, she stated she
> had no insurance in force with other companies nor any applications pending.  In
> fact, at this time she had policies for $710,000 with $300,000 of Accidental Death
> Benefit in force and she had applied for an additional $1,000,000 insurance which
> was pending issue.  In a telephone interview, she stated her combined salary with
> her husband was $240,000 annually and their assets were $2,300,000.
>
> . . .
>
> If accurate and complete answers had been given to the questions on the
> Applications for Insurance, no insurance would have been issued.  Accordingly,
> Modern Woodmen declines payment of the death proceeds and refunds all
> premiums which have been paid.

(Doc. 87-39 at 65).  Modern Woodmen "reserve[d] all defenses it may have overlooked or failed

to mention" and declared that it would "be at liberty to assert any such defenses in the future, as

necessary." (*Id.* at 66).

By letter dated May 22, 2013, Modern Woodmen advised Tom Mitchell of additional

information it had learned during its claim review:

> [A]dditional information has been obtained concerning Ms. Mitchell's statements
> on her Applications and her September 4, 2008 Statement of Acceptance of Life
> Insurance Certificate.   We have learned that she had $500,000 Accidental Death
> Benefit in force with American General as of August 2007.  It also appears her
> June 19, 2008 application to American General was declined August 1, 2008,
> although it is uncertain whether Ms. Mitchell had been informed of this decision.
> Additional efforts to obtain the American General life insurance continued and the
> coverage in the amount of $1 million was ultimately issued August 28, 2008.
> During the same timeframe, Ms. Mitchell also applied for $1 million life
> insurance with Prudential on August 7, 2008.
>
> On her Applications for Insurance dated March 26, 2008 and August 4, 2008, Ms.
> Mitchell indicated she did not have any Accidental Death Benefit in force.  In fact,
> she already had $500,000 of Accidental Death Benefit in force.
>
> On her Application for Insurance dated August 4, 2008, Ms. Mitchell stated she
> had not applied for life insurance that was currently pending nor was she planning
> on purchasing life insurance with another company.  Further, she indicated she
> had not had life insurance rejected, rated, postponed, modified, or cancelled.  If
> she was not aware of the initial rejection by American General, then she
> misrepresented that she did not have any other life insurance application pending.
> If, however, she was aware of the initial rejection from American General, then
> she misrepresented that she had not had any life insurance rejected.
>
> On the Statement of Acceptance of Life Insurance Certificate signed by Ms.
> Mitchell on September 4, 2008, she represented that since the application on
> August 4, 2008 she had not applied for other life insurance.  In fact, she had
> applied for $1 million with Prudential on August 7, 2008.

(Doc. 97-24 at 2).   Modern Woodmen asserted that "[t]hese material misrepresentations lend

additional support to the decision to decline payment of benefits." (*Id.* at 3).  Modern Woodmen

again "reserve[d] all defenses it may have overlooked or failed to mention" and stated that it

would "be at liberty to assert any such defenses in the future, as necessary." (*Id.*)

13

## II.     STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation to former rule omitted); FED. R. CIV. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[7]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [-now dispute-] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[7] Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." FED. R. CIV. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word-genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination." *Id.*  "'Shall' is also restored to express the direction to grant summary judgment." *Id.*  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 259).   However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50; *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

All justifiable inferences from the evidence are to be drawn in favor of the nonmovant. *Anderson*, 477 U.S. at 255.  The nonmovant need not be given the benefit of every inference, but only of every reasonable inference.  *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."  *Allen*, 121 F. 3d at 646 (citations omitted).

## III.   ANALYSIS

Before the court are the parties' cross-motions for summary judgment.  Except for Plaintiffs' bad-faith claim, which is addressed only in Modern Woodmen's motion and Plaintiffs' opposition thereto, the parties' motions are essentially mirror images of each other; the same arguments are offered in support of and against both motions.  Accordingly, the court will address both motions for summary judgment together, first considering Plaintiffs' breach of contract claim with respect to the First Certificate and then considering their breach of contract claim with respect to the Second Certificate.  The court will then address Plaintiffs' bad-faith claim with respect to both certificates.

15

A.      **Plaintiffs' Claim for Breach of the First Certificate**

Modern Woodmen contends that it is entitled to summary judgment on Plaintiffs' claim for breach of the First Certificate because it was induced to issue the certificate by fraud. Modern Woodmen argues that (1) in her application, Stephanie Mitchell suppressed and concealed the truth that the Mitchells had little or no income;  (2) in her interview with Reliable Reporting, Stephanie misrepresented the truth about the Mitchells' income; (3) Stephanie intended for Modern Woodmen to rely on Tom Mitchell's financial form, which also misrepresented the truth about the Mitchells' income; (4) in her application, Stephanie misrepresented the amount of her existing life insurance with all external companies and misrepresented that she had no life insurance applications pending; and (5) in her application, Stephanie misrepresented that she had no existing accidental death coverage.  Modern Woodmen argues that, as a result of this alleged fraud, it was entitled to rescind the First Certificate and deny coverage.

Plaintiffs assert that all of Modern Woodmen's reasons for denying coverage fail.  They argue that Stephanie Mitchell made no representation in her application about her income; that Modern Woodmen is precluded from relying on either the Reliable Reporting interview or Tom Mitchell's financial form as a basis to deny coverage; and that any alleged misrepresentations in the application regarding Stephanie's income or other insurance (whether in force or applied for) were not material.  Plaintiffs assert that they, not Modern Woodmen, are entitled to summary judgment on their claim for breach of the First Certificate.

16

### 1.      Stephanie Mitchell's alleged suppression of the truth about her income

In response to the question on her first insurance application regarding annual income, Stephanie Mitchell stated that she had a "shared income" with her husband. (Doc. 87-39 at 29). Modern Woodmen asserts that this representation was a "misleading half-truth by which [Stephanie] suppressed and concealed the truth of her financial circumstances." (Doc. 86 at 51). Modern Woodmen argues that had Stephanie told the truth that she and her husband had "little or no income ... it is certain that no insurance would have been issued." (*Id.* at 53).

Section 6-5-102 of the Code of Alabama provides that "[s]uppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular facts of the case." A "material fact" under § 6-5-102 is "a fact of such nature as to induce action on the part of the complaining party." *Crigler v. Salac*, 438 So. 2d 1375, 1381 (Ala. 1983). "The question of whether a particular fact is or is not material is almost invariably a question for the jury, which is entitled to consider the factual context in which the determination is made." *State Farm Gen. Ins. Co. v. Oliver*, 658 F. Supp. 1546, 1552 (N.D. Ala. 1987) (emphasis omitted).

In the insurance context, "[a]n insurance company is entitled to all material information bearing upon the obligation it undertakes in issuing a policy." *Liberty Nat. Life Ins. Co. v. Hale*, 230 So. 2d 526, 530 (Ala. 1970). "'Insurance companies are entitled to candid and truthful answers, and when such candor is withheld and involves matters material to the risk, no just complaint can be raised, when, in after investigations, the falsity is discovered and the policies issued in reliance upon the truthfulness of the statements, are avoided.'" *Id.* at 530 (quoting *New*

17

*York Life Ins. Co. v. Horton*, 180 So. 277, 282 (Ala. 1938)).

Here, Stephanie Mitchell stated in her insurance application that she had a "shared income" with her husband.  Even though she also represented in the application that she kept the books for her husband's businesses, she provided no information about the amount of the shared income.  She did not tell Modern Woodmen that her husband's businesses had income of only $4,521 in 2007, that they had ended the year with only $2,500 in inventory, or any other information about their financial circumstances.  Despite omitting this information, Stephanie expressly represented in the application that her answers were "true, ***complete***, and correctly recorded." (Doc. 87-39 at 31) (emphasis added).  Moreover, the application was attached to and made a part of the First Certificate, which contained the following instruction on the cover page:

> **LOOK AT A COPY OF THE APPLICATION** included in this certificate.
> This certificate was issued based on the answers on the application.  If all answers
> are not true and complete, insurance benefits may be affected.

(Doc. 87-39 at 10).  There is no evidence that Stephanie made any changes to her answers when she accepted the First Certificate.

Plaintiffs argue that "[t]he issue regarding Stephanie Mitchell's income is a red herring" because, as a non-working spouse, she was entitled to the same amount of insurance as her husband, who had $3 million of coverage with Modern Woodmen. (Doc. 95 at 35-36).  The record is clear, however, that Stephanie consistently represented that she was a working spouse. In both of her applications to Modern Woodmen and in her interviews with Reliable Reporting, she stated that she worked in her husband's businesses.  In fact, according to the Reliable Reporting interview summaries, Stephanie stated that she worked more than 40 hours per week. (*See* Doc. 87-49 at 5, 8).  Because she was a working spouse, Modern Woodmen's underwriting

18

guideline allowing a non-working spouse to receive the same amount of insurance as the working spouse does not apply.

Although Plaintiffs do not address Modern Woodmen's suppression argument directly, they do argue that Stephanie Mitchell's alleged misrepresentations about her income (as well as her alleged misrepresentations about her other insurance) were not material because they did not concern her health and medical condition and therefore did not increase Modern Woodmen's risk of loss. (*See* Doc. 95 at 33-37).  Modern Woodmen counters that information about an applicant's income (and other insurance) is material and does increase an insurer's risk of loss, noting that "[p]recisely because an insured should not be worth more dead than alive, insurers limit the amount of coverage they are willing to issue based on an applicant's income or other financial circumstances and their other insurance." (Doc. 99 at 16-17).  In this regard, Modern Woodmen asserts that it would not have issued the First Certificate had Stephanie told the truth about her "shared income":

> [T]he Mitchells' shared income for the entire year of 2007 was $4,521.  Assuming that half or even all of that shared income was Stephanie's, the maximum amount of insurance she would have qualified for, from all insurers, was $113,025 (income of $4,251 times the factor listed in Modern Woodmen's underwriting chart of 25 equals $113,025).  She already had $510,000 in existing coverage and another $200,000 application pending.  No insurer would have issued Stephanie Mitchell life insurance had she told the truth in response to the questions on the application about income and other insurance.

(Doc. 86 at 53-54).

As noted above, and as both parties acknowledge, the question whether a fact is or is not material is generally a jury question.  *Oliver*, 658 F. Supp. at 1552.  After carefully reviewing the record, the court concludes that the materiality of Stephanie Mitchell's income and her failure to

disclose the "whole truth" about her income in her application is a matter for the jury to decide. The evidence on this issue is not so one-sided that either party must prevail as a matter of law. The evidence presents a genuine dispute as to whether Modern Woodmen would have issued the First Certificate had Stephanie provided a "complete" answer to the question regarding her annual income, which the application and the certificate itself required.

### 2. Modern Woodmen's reliance on the Reliable Reporting interview

As discussed above, Modern Woodmen retained Reliable Reporting to interview Stephanie Mitchell in connection with her first application for life insurance. Modern Woodmen argues that Stephanie's representations to Reliable Reporting regarding the Mitchells' income–that her salary was more than $70,000 and that her husband's income was more than $80,000– were false and that Modern Woodmen was entitled to rely on those alleged misrepresentations as a basis for rescinding the First Certificate and denying coverage. Plaintiffs, in addition to disputing the materiality of the alleged misrepresentations, assert that the Reliable Reporting interview summary is not part of the First Certificate and cannot be used to rescind the certificate. The court agrees.

The Entire Contract provision in the First Certificate provides that the certificate is a "legal contract" consisting of the certificate itself; any endorsements or benefit riders; the "attached copy" of the application; any amendments, supplemental applications, or "other attached papers"; and Modern Woodmen's Articles of Incorporation, By-Laws, and any amendments thereto. (Doc. 87-39 at 18). It further provides that "[n]o statement will void this certificate or be used in defense of a claim unless ... it is contained in the application; and ... such application is attached to this certificate." (*Id.*) It is undisputed that the Reliable Reporting

interview summary was not attached to the First Certificate.  Under the plain language of the

First Certificate, therefore, the Reliable Reporting interview is not part of the insurance contract

and Modern Woodmen cannot use the statements in the summary as grounds to void the

certificate as a matter of law.[8]

In its motion for summary judgement, Modern Woodmen concedes that the Entire

Contract provision in the First Certificate, "if considered alone, would seem to preclude" Modern

Woodmen from relying on the Reliable Reporting interview in rescinding the First Certificate.

(Doc. 86 at 62).  Modern Woodmen argues, however, that the Authorization in Stephanie's

insurance application–pursuant to which she authorized third-parties to give certain information

about her to Modern Woodmen–allows Modern Woodmen to use the Reliable Reporting

interview as a basis to deny coverage.  Modern Woodmen points to Stephanie's acknowledgment

that "the information obtained by use of this Authorization will be used by Modern Woodmen to

determine eligibility for insurance coverage or for benefits thereunder." (Doc. 87-39 at 32).

Modern Woodmen contends that, based on this Authorization, it was entitled to use the Reliable

Reporting interview to avoid coverage under the First Certificate, notwithstanding the Entire

Contract provision in the certificate. (*Id.* at 63).  The court does not agree.

First, it is evident that the Authorization in the application does not apply to the Reliable

Reporting interview of Stephanie Mitchell.  In the Authorization, Stephanie authorized third-

parties to give and disclose to Modern Woodmen certain types of information they possessed

---

[8]Modern Woodmen may be entitled to use the Reliable Reporting interview for other purposes,
however, such as establishing the extent of Stephanie Mitchell's alleged concealment of the truth about
her income and her alleged efforts to mislead Modern Woodmen about the state of the Mitchells'
financial situation.

about Stephanie.  (Doc. 87-39 at 32).  For instance, she authorized "any physician" to disclose information relating to her "physical condition" and "health history." (*Id.*)  She did not authorize Modern Woodmen to hire a third-party such as Reliable Reporting to conduct a personal interview of her.  The information in the Reliable Reporting interview summary was information Modern Woodmen obtained pursuant to a separate provision in the application: "I understand that I might be personally interviewed if an Investigative Consumer Report is prepared in connection with this application."[9] (Doc. 87-39 at 31).

Second, even assuming that the Authorization covered the Reliable Reporting interview, Modern Woodmen was still required to attach the interview summary to the First Certificate to make it part of the parties' contract and was still precluded from relying on any statement as a reason to void the certificate or deny a claim for benefits unless it was contained in the application and attached to the certificate.  In other words, Modern Woodmen was still bound by the Entire Contract provision of the First Certificate.  Modern Woodmen was entitled to use any information it obtained pursuant to the Authorization to determine eligibility for benefits, as Stephanie acknowledged in the application, but it could use such information as a reason to deny coverage only if it attached the information to the First Certificate.  Modern Woodmen did not attach the Reliable Reporting interview summary to the certificate.  Consequently, it is precluded from relying on any statements in the summary as grounds to deny coverage.

The court acknowledges that this result may seem harsh, especially in light of the

---

[9]An "investigative consumer report" is "a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information." 15 U.S.C. § 1681a(e).

evidence that Stephanie Mitchell may, in fact, have lied to Reliable Reporting about the amount of the Mitchells' income and their financial status.  However, "[i]nsurance contracts are to be enforced as they are written, as long as there is no ambiguity in the provisions involved." *Progressive Speciality Ins. Co. v. Naramore*, 950 So. 2d 1138, 1141 (Ala. 2006).  If there is an ambiguity, it should be "strictly construed against the drafter and liberally in favor of the insured." *Mega Life & Health Ins. Co. v. Pieniozek*, 516 F.3d 985, 992 (11th Cir. 2008). "If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in the policy ... by making a new policy for the parties." *Shrader v. Employers Mut. Cas. Co.*, 907 So.2d 1026, 1034 (Ala. 2005).

Here, Modern Woodmen has made no argument that there is any ambiguity in the Entire Contract provision of the First Certificate, which it drafted.  The court must enforce the provision as written.  The court notes, parenthetically, that Modern Woodmen could have easily attached the interview summary to the First Certificate and made it part of the parties' contract.  Because it did not, it cannot rely on the interview summary as a reason to rescind the certificate and deny coverage as a matter of law.

### 3.    Modern Woodmen's reliance on Tom Mitchell's financial form

Modern Woodmen also argues that it was entitled to rely on the alleged misrepresentations in Tom Mitchell's financial form in rescinding the First Certificate.  Modern Woodmen asserts that Stephanie Mitchell and Modern Woodmen knew and intended that the financial form would be used in underwriting the First Certificate (as well as the Second Certificate). (Doc. 86 at 59)  Modern Woodmen asserts that "Stephanie Mitchell's application itself not only contemplated but directed that information not stated therein, specifically Tom

23

Mitchell's financial questionnaire, be relied on in issuing the certificates." (*Id.* at 61).  Plaintiffs dispute that assertion, and argue that "[t]here is no evidence that Stephanie Mitchell ever saw Tom Mitchell's Financial Form or even knew what it said." (Doc. 95 at 7).  Plaintiffs further assert that the Entire Contract provision in the First Certificate precludes Modern Woodmen from relying on the financial form, just as it precludes Modern Woodmen from relying on the Reliable Reporting interview. (Doc. 100 at 11-12).

The court agrees with Plaintiffs that Stephanie Mitchell's first application did not direct that Tom Mitchell's financial form be relied on in issuing the First Certificate.  The financial form is not referenced anywhere in the application. (*See* Doc. 87-39 at 26-33).  Laura Williams's Agent's Report does reference the financial form (*see* doc. 87-39 at 36), but it is not referenced in the application itself.  Modern Woodmen has offered no evidence that Stephanie directed Modern Woodmen to rely on the financial form.  Indeed, Modern Woodmen states in its motion for summary judgment that Laura Brown, the underwriter who underwrote Stephanie's first application, relied on Tom Mitchell's financial form "because she was directed to [it] by the statement in the Agent's report," not because she was directed to it by anything in Stephanie's application. (Doc. 86 at ¶ 39).

The court also agrees with Plaintiffs that the Entire Contract provision of the First Certificate precludes Modern Woodmen from relying on Tom Mitchell's financial form as a basis to rescind the certificate and deny coverage, even if the parties did intend that the financial form would be used in underwriting the certificate.[10]  Like the Reliable Reporting interview

_____

[10]As with the Reliable Reporting interview, Modern Woodmen may be entitled to use the financial form for other purposes.

summary, Tom Mitchell's financial form was not attached to the First Certificate and, consequently, is not part of the parties' insurance contract and cannot be used by Modern Woodmen as a reason to void the certificate as a matter of law.

### 4.     Stephanie Mitchell's misrepresentations regarding her existing life insurance and pending life insurance applications

In her first insurance application, Stephanie Mitchell represented that she had a total of $200,000 in life insurance in force with other companies and no pending applications for life insurance. (Doc. Doc. 87-39 at 29).  In reality, she had $510,000 in life insurance in force with American General and a pending application with American General for an additional $200,000 in life insurance. (Doc. 86 at ¶¶ 3-8, 24; Doc. 101-28).  Modern Woodmen asserts that it is entitled to rescind the First Certificate based on the misrepresentations in the application regarding Stephanie's other life insurance, while Plaintiffs assert that the misrepresentations were not material.[11]

Under Alabama law, "material misrepresentations ... in insurance applications *may* constitute fraud that is sufficient to void the resulting policy." *Nationwide Mut. Fire Ins. Co. v. Guster Law Firm*, 944 F. Supp. 2d 1116, 1124 (N.D. Ala. 2013).  To prove fraud based on a misrepresentation, the complaining party must show "a misrepresentation of a material fact, reliance, and that it sustained damages as a proximate result of the misrepresentation." *Id.* at 1125.  A "material fact" is "a fact of such nature as to induce action on the part of the complaining party." *Bank of Red Bay v. King*, 482 So. 2d 274, 282 (Ala. 1985).  The

_____

[11]It is not clear from Modern Woodmen's motion for summary judgment whether Modern Woodmen contends that the misrepresentations regarding Stephanie's other life insurance, standing on their own, support rescission of the First Certificate, but the court will assume Modern Woodmen is making that contention.

misrepresentation need not be the sole inducement; it is sufficient "if it materially contributes and is of such a character that the [complaining] party would not have consummated the contract, had he known the falsity of the statement." *Id.*

Although the materiality of a misrepresentation is generally a jury question, Modern Woodmen's own evidence and argument establish that the misrepresentations in Stephanie Mitchell's first application regarding her other life insurance (existing and applied for) were not material as a matter of law.  As previously noted, Modern Woodmen asserts that the maximum amount of life insurance Stephanie Mitchell would have qualified for, given her true income, was $113,025. (Doc. 86 at 53-54).  Therefore, accepting Modern Woodmen's argument in its entirety, Stephanie's representations in her application that she had only $200,000 in existing life insurance and had not applied for any other insurance were not material.  Even as represented in her application, she already had more life insurance than she qualified for.

### 5.    Stephanie Mitchell's misrepresentation regarding her existing accidental death coverage

Modern Woodmen's final ground for rescinding the First Certificate is that Stephanie Mitchell represented in her insurance application that she had no existing accidental death coverage, when in fact she had $500,000 in accidental death coverage with American General. Modern Woodmen argues that this misrepresentation "is alone enough to void the first Modern Woodmen certificate" because "Modern Woodmen has a strict policy that an insured may be issued only $350,000 in accidental death coverage with all insurers."  (Doc. 86 at 49).  Plaintiffs counter that "[t]he Accidental Death Benefit Rider is a separate agreement contained within the [First] Certificate and its invalidity cannot void the entire Certificate."  (Doc. 95 at 37).

26

There is no genuine dispute of material fact that Stephanie Mitchell had $500,000 in accidental death coverage with American General when she submitted her first application to Modern Woodmen and that Modern Woodmen would not have issued the $350,000 accidental death benefit rider had it known about her existing coverage.  Modern Woodmen's underwriting guidelines expressly provide that "[t]he total AD [accidental death benefit] on the Insured's life with all insurers may not exceed $350,000." (Doc. 88-2 at ES0679).  Leslie Brown, the underwriter who approved Stephanie's first insurance application, confirmed this limitation. (Doc. 87-64 at ¶ 5).  The court is satisfied that Stephanie's misrepresentation that she had no existing accidental death coverage entitles Modern Woodmen to rescind the $350,000 accidental death rider in the First Certificate as a matter of law.

However, the court agrees with Plaintiffs that the invalidity of the accidental death benefit rider cannot serve as a basis to rescind the entire First Certificate, because the accidental death benefit rider was severable from the other provisions of the certificate.  In Alabama, "the divisibility of a contract depends on the intention of the parties as found from the apportionability of the contract's consideration, the subject matter and object of the entire contract, and any other pertinent facts surrounding its making at the time it was made."  *Village Inn Pancake House of Mobile, Inc. v. Higdon*, 318 So. 2d 245, 249 (Ala. 1975).  Here, the First Certificate provided $1 million in life insurance coverage and separately provided $350,000 in accidental death coverage. There was separate consideration–separate annual premiums–for each coverage.  (*See* Doc. 87-39 at 12-14).  Moreover, the two coverages insured against different losses; as Modern Woodmen itself has noted, "[b]asic life insurance covers expected losses (such as lost future income)," while "[a]ccidental death coverage addresses unexpected losses (such as medical bills)." (Doc.

27

99 at 16).  Finally, Judy Gackle, the Modern Woodmen Claim Manager who denied the claim for benefits under both certificates, conceded that "no one has said that we would reject [life] insurance just because [Stephanie Mitchell] misrepresented ADB. ... The ADB alone was not a reason to reject [Stephanie's application for life insurance], but we would simply have not issued that much ADB." (Doc. 97-1 at 31).

Under these facts, the court concludes that Stephanie Mitchell's misrepresentation that she had no existing accidental death coverage supports rescission of the accidental death benefit rider in the First Certificate, but does not support rescission of the life insurance benefit.  The accidental death benefit was severable from the remainder of the First Certificate.

### 6.    Decision as to Plaintiffs' claim for breach of the First Certificate

Based on the above discussion, the court concludes that Modern Woodmen is entitled to a summary judgment in its favor on Plaintiffs' claim that it breached the First Certificate by failing to pay the $350,000 accidental death benefit.  The court finds that Modern Woodmen would not have issued the accidental death benefit rider had it known that Stephanie Mitchell already had $500,000 in accidental death coverage with American General.

The court further concludes that neither party is entitled to a summary judgment on Plaintiffs' claim that Modern Woodmen breached the First Certificate by failing to pay the $1 million life insurance benefit.  There is a genuine issue of material fact as to whether Modern Woodmen would have approved Stephanie Mitchell's application for $1 million in life insurance had she given a complete answer to the question in the application regarding her annual income.

### B.    Plaintiffs' Claim for Breach of the Second Certificate

Modern Woodmen asserts that it is entitled to summary judgment on Plaintiffs' claim for

28

breach of the Second Certificate because, like the First Certificate, it was induced to issue the
Second Certificate by fraud.  Modern Woodmen argues that (1) in her second insurance
application, Stephanie Mitchell again suppressed and concealed the truth about her income; (2) in
her second interview with Reliable Reporting, Stephanie again misrepresented the truth about her
income; (3) in her application, Stephanie again directed Modern Woodmen to her husband's
financial form; and (4) in her application and in the Statement of Insurability she signed when
she accepted the Second Certificate, Stephanie misrepresented the amount of her existing life
insurance with other companies and misrepresented that she had no life insurance applications
pending.  Modern Woodmen contends that, as a result of this alleged fraud, it was entitled to
rescind the Second Coverage and deny coverage.

Once again, Plaintiffs argue that all of Modern Woodmen's reasons for denying coverage
fail.  They argue that Stephanie Mitchell made no representation in her second application about
her income; that Modern Woodmen is precluded from relying on the second Reliable Reporting
interview, Tom Mitchell's financial form, or the Statement of Insurability as a basis to deny
coverage; and that any alleged misrepresentations in the application or the Statement of
Insurability regarding Stephanie's other insurance (in force or applied for) were not material.
Plaintiffs again assert that they, not Modern Woodmen, are entitled to summary judgment on
their claim for breach of the Second Certificate.

>    **1.    Stephanie Mitchell's alleged suppression of the truth about her
>           income**

Stephanie Mitchell's second insurance application, which she submitted on August 4,
2008, contained the following notation next to the question regarding annual income: "check on

Tom James Mitchell Financial Form 186." (Doc. 87-39 at 55).  Modern Woodmen contends that this notation constitutes another "half-truth" about the Mitchells' income.  Modern Woodmen argues that it is entitled to rescind the Second Certificate because Stephanie did not disclose the truth that she and her husband had no income, but instead directed Modern Woodmen to Tom Mitchell's financial form. (Doc. 86 at 71-72).

For the same reasons discussed above with respect to Stephanie Mitchell's statement in her first application that she had a "shared income" with her husband, the court concludes that the materiality of Stephanie's failure to disclose the "whole truth" about her annual income in her second application is a matter for the jury to decide.  There is a genuine dispute of material fact as to whether Modern Woodmen would have issued the Second Certificate had Stephanie given a complete (and truthful) answer about her annual income in her second application, rather than referring Modern Woodmen to her husband's financial form.

### 2. Modern Woodmen's reliance on the second Reliable Reporting interview

Modern Woodmen contends that it was entitled to rely on the alleged misrepresentations made by Stephanie Mitchell in her second interview with Reliable Reporting–particularly her alleged misrepresentation that her salary was $240,000–in rescinding the Second Certificate. Once again, however, Modern Woodmen did not attach the Reliable Reporting interview summary to the Second Certificate.  For all of the reasons discussed above with respect to the first Reliable Reporting interview, the Entire Contract provision in the Second Certificate precludes Modern Woodmen from relying on any statements in the second interview as a basis to void the certificate or defend Plaintiffs' claim for benefits as a matter of law.  Because the second

interview summary was not attached to the Second Certificate, it is not a part of the parties' second insurance contract.

### 3. Modern Woodmen's further reliance on Tom Mitchell's financial form

Modern Woodmen argues that it was also entitled to rely on the alleged misrepresentations in Tom Mitchell's financial form in rescinding the Second Certificate.  As previously noted, Modern Woodmen alleges that Stephanie Mitchell knew and intended that the financial form would be used by Modern Woodmen in underwriting her insurance certificates.  In this regard, there is one significant difference between Stephanie Mitchell's first insurance application to Modern Woodmen and her second application.  Whereas her first application contained no reference to Tom Mitchell's financial form, her second application contained the express notation to "check on" the financial form.  Although the notation was made by Laura Williams, the agent who filled out the second application, Stephanie signed the application and confirmed that the answers in the application were "true, complete, and ***correctly recorded***." (Doc. 87-39 at 57) (emphasis added).  Therefore, Stephanie was on notice that Modern would be relying on her husband's financial form in making its underwriting decision on her second application.

However, Modern Woodmen did not attach Tom Mitchell's financial form to Stephanie Mitchell's second application or to the Second Certificate.  As a matter of law, Modern Woodmen is again precluded from relying on any statements in the financial form as grounds to

31

void the certificate or to defend a claim for benefits under the Second Certificate.[12]  Stephanie

may have known and intended that Modern Woodmen would rely on the financial form in

making its underwriting decision, but Modern Woodmen was still required to attach the financial

form to the Second Certificate if it wanted to make the financial form a part of the parties'

insurance contract and wanted to be able to use the financial form as a basis to void the

certificate.

Modern Woodmen cites *Massachusetts Mut. Life Ins. Co. v. Crenshaw*, 65 So. 65 (Ala.

1914), in support of its argument that it was entitled to rely on Tom Mitchell's financial form

notwithstanding the Entire Contract provision in the Second Certificate.  In *Crenshaw*, two life

insurance policies were issued on the life of an insured.  In the application for the policies, the

insured acknowledged that "the insurance hereby applied for shall not be in force until

acceptance and approval of this application by the company at its home office, the delivery of the

policy to me or my agent, and the payment of the first premium as required therein during my

present condition of health." *Id.* at 66.  The policies, in turn, contained the following provision:

"This policy and the application herefor constitute the entire contract between the parties.  All

statements made by the applicant shall, in the absence of fraud, be deemed representations and

not warranties, and no such statement shall be used in defense to a claim under this policy unless

it is contained in the application and a copy of the application is hereto annexed." *Id.*

In defending a suit on the policies, the insurer sought to rely on misrepresentations made

by the insured in a certification of good health he signed when the policies were delivered. The

---

[12]Again, Modern Woodmen may be entitled to rely on the financial form, as well as the second
Reliable Reporting interview, for other purposes, such as establishing the scope of Stephanie Mitchell's
alleged efforts to continue to conceal the truth about her income and the Mitchells' financial condition.

Supreme Court of Alabama held that, notwithstanding the "entire contract" provision in the policies, the insurer was entitled to defend the suit based on the insured's misrepresentations in the good health certification.  The court determined that "[t]he contracts, evidenced by the application and the policies, manifestly contemplated a delivery subsequent to, even, the acceptance and approval of the application" and that "[o]bviously, it was not the intent of the [entire contract] provision ... to restrict the basis for fraud to conditions prevailing at the time the application was made; since misrepresentations possible of utterance subsequent thereto only could not, of necessity, have been incorporated in the application." *Id.* at 67.

Unlike the good health certification in *Crenshaw*, Tom Mitchell's financial form existed at the time Stephanie Mitchell submitted her second insurance application to Modern Woodmen and was referenced in the application itself.  The representations in the financial form concerned conditions–the Mitchells' financial conditions–prevailing at the time the application was made, not subsequent to acceptance and approval of the application.  Moreover, the representations in the financial form could have been incorporated in the application by attaching the financial form to the application.  Indeed, the Second Certificate expressly provides that the insurance contract includes "the attached copy of the application ... [and] any amendments, supplemental applications, or ***other attached papers***." (Doc. 87-39 at 46) (emphasis added).  Therefore, because Modern Woodmen could have attached the financial form to the application but did not, it is precluded as a matter of law from relying on the financial form as a basis to void the Second Certificate and deny coverage.

33

### 4.     Stephanie Mitchell's misrepresentations regarding her existing life insurance and pending life insurance applications

In Stephanie Mitchell's second insurance application to Modern Woodmen, she represented that she had no existing life insurance contracts with another company; that she had no pending life insurance applications with another company; and that she had not had any life insurance rejected.  In realty, she had $710,000 in existing life insurance coverage and $500,000 in existing accidental death coverage with American General.  She had also applied to American General for an additional $1 million in life insurance; American General initially declined the application three days before Stephanie submitted her second application to Modern Woodmen. In addition, when the Second Certificate was delivered to Stephanie, she signed a Statement of Insurability in which she represented that she had not applied for other life insurance since the date she submitted her application to Modern Woodmen.  In fact, she had a pending application with Prudential for $1 million in life insurance and $500,000 in accidental death coverage.

Modern Woodmen argues that it was entitled to rescind the Second Certificate based on Stephanie Mitchell's misrepresentations about her other life insurance (existing and applied for) in her second application and in her Statement of Insurability.  Plaintiffs argue that Modern Woodmen is not entitled to rely on any alleged misrepresentations in the Statement of Insurability because it was not attached to the Second Certificate and because Modern Woodmen did not reference the Statement of Insurability in its initial denial letter to Tom Mitchell.  They further argue that the alleged misrepresentations in both the second application and the Statement of Insurability were not material to Modern Woodmen's decision to issue the Second Certificate.

Based on the Supreme Court of Alabama's decision in *Crenshaw*, the court agrees with

34

Modern Woodmen that it may rely on Stephanie Mitchell's Statement of Insurability even though it was not attached to the Second Certificate. As concerns the Statement of Insurability, the facts of *Crenshaw* are on all fours with the facts of this case. The Statement of Insurability (unlike Tom Mitchell's financial form) concerned conditions that were not prevailing at the time Stephanie submitted her second application to Modern Woodmen. One of the very purposes of the Statement of Insurability was to confirm that the conditions with respect to Stephanie's other life insurance had not changed since the date she submitted her application. Under the Supreme Court of Alabama's holding in *Crenshaw*, Modern Woodmen may defend Plaintiffs' claim for benefits based on the representations in the Statement of Insurability.[13]

The court also rejects Plaintiffs' argument that Modern Woodmen cannot rely on Stephanie's Statement of Insurability because it was not referenced in Modern Woodmen's initial denial letter. In its initial denial letter, Modern Woodmen expressly reserved "all defenses it may have overlooked or failed to mention" and expressly declared that it would "be at liberty to assert any such defense in the future, as necessary." (Doc. 87-39 at 66). It did not limit its denial of benefits to the defenses asserted in its first letter. *See Sharp Realty & Mgt., LLC v. Capitol Speciality Ins. Corp.*, 2012 WL 2049817, *23 (N.D. Ala. May 31, 2012) (rejecting insured's claim that insurer had waived misrepresentation as a reason for denial of coverage, where the insurer's first denial letter reserved "all rights in connection with ... representations, statements, declarations, and omissions made in applying for the Policy") (emphasis omitted).

That leaves the issue of materiality. Just as they argue with respect to Stephanie's

---

[13]The court also notes that the Entire Contract provision in the First and Second Certificates provides that the insurance contract includes Modern Woodmen's By-Laws, which in turn state that the declaration (statement) of insurability is part of the contract. (*See* Doc. 101-9 at 6).

alleged misrepresentations about her income, Plaintiffs argue that her alleged misrepresentations about her other insurance coverage were not material because they did not concern her health and medical condition and therefore did not increase Modern Woodmen's risk of loss. Again, Modern Woodmen asserts that information about an insured's other coverage is material and does increase an insurer's risk of loss. Modern Woodmen argues that "[i]f an insured has life insurance in an amount that bears no relation to the expected financial loss that would follow his or her death, there is an increased risk of suicide, homicide, and 'accidental' deaths." (Doc. 99 at 18).

After carefully reviewing the record, the court concludes that the materiality of Stephanie Mitchell's representations that she had no other existing life insurance and no pending applications for life insurance is a matter for the jury to decide. The evidence presents a genuine dispute as to whether Stephanie's statements regarding her other insurance (or lack thereof) materially contributed to Modern Woodmen's decision to issue the Second Certificate. There is a genuine dispute as to whether Modern Woodmen would have issued the Second Certificate had it known, at the time Stephanie submitted her second application, that Stephanie had $710,000 in existing life insurance and $500,000 in existing accidental death insurance with American General and had applied to American General for an additional $1 million in life insurance, and had it known that Stephanie had applied to Prudential for another $1 million life insurance policy along with $500,000 in accidental death coverage between the time she submitted her application to Modern Woodmen and the date the Second Certificate was delivered.

### 5.    Decision as to Plaintiffs' Claim for Breach of the Second Certificate

Based on the above, the court concludes neither Modern Woodmen nor Plaintiffs are

36

entitled to a summary judgment on Plaintiffs' claim for breach of the Second Certificate. There are genuine disputes of material fact that preclude the entry of summary judgment in favor of either party.

### C.    Plaintiffs' Bad-Faith Claim

In their complaint, Plaintiffs allege that Modern Woodmen "has intentionally refused to pay" their claim for benefits under both the First and Second Certificates "with no lawful basis for its refusal[ ] to do so" and, alternatively, that Modern Woodmen "has intentionally failed to determine whether or not there was any lawful basis for its refusal" to pay the claim. (Doc. 1 at 8). Modern Woodmen argues that it is entitled to judgment as a matter of law on both bad-faith theories.

The Supreme Court of Alabama has clarified that "there is only *one* tort of bad-faith refusal to pay a claim, not two 'types' of bad faith or two separate torts." *State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257-58 (Ala.. 2013) (emphasis in original). The tort has four elements, plus a conditional fifth element, as follows:

(a)    an insurance contract between the parties and a breach thereof by the defendant;

(b)    an intentional refusal to pay the insured's claim;

(c)    the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

(d)    the insurer's actual knowledge of the absence of any legitimate or arguable reason;

(e)    if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*National Sec. Fire & Cas. Co. v. Bowen*, 417 So.2d 179, 183 (Ala. 1982).  Requirements (a) through (d) represents the "normal" bad-faith case and requirement (e) represents the "abnormal" case.  *Brechbill*, 144 So. 3d at 258.[14]

The Supreme Court of Alabama has emphasized the "heavy burden" a plaintiff asserting a bad-faith claim bears:

> The plaintiff asserting a bad-faith claim bears a heavy burden. To establish a prima facie case of bad-faith refusal to pay an insurance claim, a plaintiff must show that the insurer's decision not to pay was without any ground for dispute; in other words, the plaintiff must demonstrate that the insurer had no legal or factual defense to the claim.  The insured must eliminate any arguable reason propounded by the insurer for refusing to pay the claim.

*Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1154 (Ala. 2001) (internal citations and quotation marks omitted).  For a plaintiff to make out a *prima facie* case of bad-faith refusal to pay in the "normal" case, "the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law." *Nat. Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).  The "directed verdict" standard does not apply in all cases; it does not apply in the "abnormal" case in which the plaintiff produces "substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4)  relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim." *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 306-07 (Ala. 1999).  In either case, however, the plaintiff must establish the third

---

[14]In *Brechbill*, the Supreme Court of Alabama also used the terms "bad-faith refusal to pay" and "bad-faith refusal to investigate" in place of the terms "normal" and "abnormal" bad faith.

element of bad faith–namely, the absence of a legitimate basis for denial.  *See Brechbill*, 144 So. 3d at 258 ("Regardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element, absence of legitimate reason for denial.").

      **1.     Modern Woodmen's alleged bad-faith refusal to pay benefits under the First Certificate**

As discussed, Stephanie Mitchell's First Certificate provided $1 million in life insurance benefits and $350,000 in accidental death benefits.  Modern Woodmen is entitled to a summary judgment on Plaintiffs' claim for bad-faith refusal to pay benefits under the First Certificate for two reasons.  First, to the extent Plaintiffs allege that Modern Woodmen is liable for bad-faith refusal to pay their claim for accidental death benefits, their bad faith claim fails as a matter of law because, as discussed above, Modern Woodmen had a valid, lawful reason to deny accidental death benefits–namely, Stephanie's representation on her insurance application that she had no existing accidental death coverage when in fact she had $500,000 in accidental death coverage in force with American General, more coverage than Modern Woodmen's underwriting guidelines allow.  *See Gulf Atlantic Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981) ("Of course, if a lawful basis for denial [of an insurance claim] actually exists, the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith.").

Second, to the extent Plaintiffs' bad-faith claim is based on Modern Woodmen's refusal to pay their claim for life insurance benefits under the First Certificate, Modern Woodmen had a legitimate, debatable reason not to pay those benefits.  The court determined above that there is a genuine dispute of material fact as to whether Modern Woodmen would have issued the First

Certificate had Stephanie Mitchell provided a complete answer to the question on her application regarding her annual income.  A jury could certainly find that Stephanie's failure to tell the "whole truth" about her income entitled Modern Woodmen to rescind the First Certificate and not pay the life insurance benefits.  Because Modern Woodmen had, at the very least, a debatable reason to deny Plaintiffs' claim for life insurance benefits under the First Certificate, Plaintiffs' bad-faith claim for refusal to pay those benefits–whether couched as "normal" bad faith or "abnormal" bad faith–fails as a matter of law.

> **2.**     **Modern Woodmen's alleged bad-faith refusal to pay benefits under the Second Certificate**

Plaintiffs also allege that Modern Woodmen is liable for bad-faith refusal to pay their claim for life insurance benefits under the Second Certificate insuring Stephanie's life.  Again, the court determined above that there is a genuine dispute as to whether Modern Woodmen would have issued the Second Certificate had Stephanie provided complete and accurate answers in her second application regarding her income and other life insurance, both in force and applied for.  In other words, Modern Woodmen once again had a legitimate, debatable reason for denying Plaintiffs' claim for benefits.  Therefore, Plaintiffs' bad-faith claim with respect to the Second Certificate also fails as a matter of law.

> **D.**     **Plaintiffs' Motion to Strike the Declaration of Judy McCoy**

In support of its motion for summary judgment, Modern Woodmen submitted the Declaration of Judy McCoy, its former Principal Underwriter. (Doc. 101-2).  Plaintiffs have moved to strike the declaration, arguing that it presents new information and testimony that is contrary to the testimony of Leslie Brown, Modern Woodmen's designated representative on the

subject of underwriting. (Doc. 104).

The court has reached its decision on the parties' competing motions for summary judgment without considering the McCoy Declaration.  The other evidence in the record is sufficient for the court to render its decision.  Accordingly, Plaintiffs' motion to strike the McCoy declaration will be denied as moot.

## IV.    CONCLUSION

For the reasons stated above, the court concludes as follows:

1.    Plaintiffs' motion for summary judgment (doc. 83) is due to be DENIED.

2.    Modern Woodmen's motion for summary judgment (doc. 86) is due to be DENIED IN PART and GRANTED IN PART.  It is due to be DENIED as to Plaintiffs' claim that Modern Woodmen breached the First Certificate by denying their claim for life insurance benefits under that certificate; GRANTED as to Plaintiffs' claim that Modern Woodmen breached the First Certificate by denying their claim for accidental death benefits under that certificate; DENIED as to Plaintiffs' claim that Modern Woodmen breached the Second Certificate by denying their claim for life insurance benefits under that certificate; and GRANTED as to Plaintiffs' bad-faith claim with respect to both certificates.

3.    Plaintiffs' motion to strike the Declaration of Judy McCoy (doc. 104) is due to be DENIED as moot.

In summary, the following claims remain viable: Plaintiffs' claim that Modern Woodmen breached the First Certificate to the extent, and only to the extent, that it is based on Modern Woodmen's denial of Plaintiffs' claim for life insurance benefits under the First Certificate; Plaintiffs' claim that Modern Woodmen breached the Second Certificate; and Modern

Woodmen's counterclaim for a declaratory judgment as to which alleged beneficiaries are to be paid benefits (which the parties agreed to defer until after the ruling on their competing motions for summary judgment).

The court will enter a separate order consistent with this Memorandum Opinion.

**DONE**, this 10th day of December, 2014.

.

**JOHN E. OTT**
Chief United States Magistrate Judge

42